May 6, 2008

**ECF FILED AND BY HAND**

Honorable Colleen McMahon
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl St.
New York, New York 10007

**Re: United States v. Richard Grant**
**S1 07 Cr. 1119(CM)**

Your Honor:

On April 30, 2008, following the hearing on our motion to suppress, Your Honor directed that certain legal issues be addressed in writing prior to the oral submissions to be delivered on May 7th.

Your Honor specifically (at Tr. 165-6) focused counsel on:

**1. "Whether there was oral consent, which of course would suffice even if the written consent form was concocted at some later date."**

Strictly as a matter of law, if there was consent to enter the apartment and then a consent to search it, such consents would be binding on Mr. Grant but, since in the scenario posited by Your Honor, you would need to find that officers Murphy and Owens had testified falsely that the first written consent had been prepared and executed in the apartment before the searches were conducted,

we respectfully suggest that their testimony that Mr. Grant had given oral consents to search should likewise be rejected since the document itself was offered by the government as proof that consent had been given before the searches were conducted.  It would appear anomalous to hold that these officers misled the court about when and how the document had been prepared and executed and yet that valid oral consents were nonetheless given.

In short, if the court finds that the document was "concocted at some later date" as Mr. Grant's testified and the government chose to not cross examine him at all on the issue of consent, the court should logically and in fairness reject the claim that oral consent was given in the apartment.

**2.  "Whether the question that he [Sergeant Murphy] testified to having asked after the gun was found, was a question that he was privileged to ask or whether Miranda warnings should have been given then."**

Although the police officers testified that, following the discovery of the weapon, Mr. Grant was not handcuffed in order to spare his young son the painful site of his father in shackles, it is clear that at that point Mr. Grant was in fact in custody so that no interrogation was permissible without <u>Miranda</u> warnings.

Nonetheless, the police concede that without giving him such warnings, he was asked if he had anything else in the apartment which he shouldn't have, in answer to which he answered that he had drugs in a kitchen drawer following which the police searched that

place and seized controlled substances charged in count two of the indictment.

It is axiomatic, Miranda v. Arizona, 384 U.S. 436 (1966), that the fruits of a custodial interrogation which is not preceded by warnings which are familiar to all of us and therefore do not require cataloging have been illegally obtained by the police such that the statements themselves and any physical evidence obtained as a result of the those statements must be suppressed.

**The police did not obtain Mr. Grant's expressed or implied consent to enter his apartment - suppression is required on that basis alone without the need to consider whatever followed after the illegal entry into it.**

Although your Honor did not address the issue of whether the police obtained a valid consent to enter Mr. Grant's apartment itself, we propose that they did not and anticipate that the government may argue alternatively that (based on officer Owens' testimony) Mr. Grant gave expressed oral consent **or**, that such consent can be implied from the fact (as claimed by the police but refuted by Mr. Grant) that Mr. Grant entered his apartment and did not resist or object to the police following him inside those premises. Of course, Sergeant Murphy testified unequivocally that on the way from the building's front door to and into the apartment, Mr. Grant had not been asked for consent to enter the apartment nor had he given such consent.

Mr. Grant testified unequivocally and was not cross-examined

on the subject that he did not go to the building's front door (as claimed by Murphy and Owens) but had simply opened his apartment door in response to the police knocking on it and that the officers then barged in without asking his consent or his giving it. Mr. Grant's testimony about when and where he had his first contact with the police (whether of the building's front door or at his apartment door) is corroborated by Officer Dalian's sworn complaint (at par. 2.b) and grand jury testimony (at 5-6) which each assert that he had been informed by one of his colleagues that the arresting officers had knocked on the defendant's apartment door. It is clear that at least one of the arresting officers who had to be Dalian's source gave him an account inconsistent with the testimony given at the hearing by both Murphy and Owens.

Since Murphy testified categorically that Mr. Grant was not asked for permission to enter his apartment (Tr. 30-2,50), the government would have to rely on the testimony of officer Owens who contradicts Murphy to whom Owens claims Grant gave consent to enter the apartment. Owens' credibility is extremely questionable for reasons to be discussed during summations, but that aside, his testimony on this point is extremely vague -- largely qualified as "in substance"-- (Tr. 63,80-3) and should therefore not be relied upon to conclude that Mr. Grant gave verbal consent to enter the apartment. His contradicting Murphy on this point should be enough to discount Owens' claim that Grant verbally consented to the entry of his apartment.

Accordingly, the government may well argue that Grant <u>impliedly</u> (albeit not verbally)gave consent to enter the apartment. That argument should fail.

In addition to express consent, consents may be implied by the circumstances surrounding the search. <u>United States v. Ros</u>, 27 F.3d 409,412 (9th Cir. 1994) (consent to enter condominium or implied because defendant provided agents with key so they could enter; <u>United States v. Gordon</u>, 173 F.3d 761, 765-6 (10th Cir. 1999) (consent to search duffel bag implied because defendant removed key from pocket and gave it to officer in response to question "[can you open that?"; <u>United States v. Ramirez-Chile</u>, 289 F.3d 744, 752 (11th Cir. 2002)(consent to enter trailer implied because defendant yielded right-of-way to officers). *But see, e.g.*, <u>United States v. McCaw</u>, 920 F.2d 224, 228 (4th Cir. 1990) (consent to officer's entry into a hotel room not implied even though the defendant partially opened door to determine identity of persons knocking); <u>United States v. Albrektsen</u>, 151 F.3d 951, 955 (9th Cir. 1998) (consent not implied because defendant moved aside to allow officer to enter hotel room to avoid being knocked down by officer); <u>United States v. Waupekenay</u>, 973 F.2d 1533, 1535-36 (10th Cir. 1992) (consent to enter trailer not implied when wife called for help in domestic dispute and testified that officer never asked for consent and she never gave it).

A consent to enter or search must be unequivocal, specific and intelligently given. <u>United States v. Shaibu</u>, 920 F.2d 1423 (9th Cir 1990) (held that a warrantless entry and search of a home was *per*

*se* unreasonable under U.S. Const. amend. IV, and entry could not be based on inferred consent. The court found that defendant did not consent to the police entry but that he opened his apartment door only to step outside to meet the police outside his apartment. The court also found that the police did not expressly or impliedly ask consent to enter. The court held that the government could not show consent from defendant's failure to object because this would have impermissibly shifted the burden to show consent to defendant. Held that in the absence of a specific request by police, defendant's failure to object to police entry was not sufficient to establish free and voluntary consent, and evidence obtained in such a search suppressed). The cases all legion which hold that to rely on implied consent to enter or search, the overall surrounding circumstances must support a finding that the defendant's conduct unequivocally and specifically intended to confer consent

The Fourth Amendment states: "The rights of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. U.S. Const. amend. IV. The Supreme Court repeatedly has held that pursuant to the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable." United States v. Karo, 468 U.S. 705, 714-15 (1984); Payton v. New York, 445 U.S. 573, 586 (1980). Homes receive the highest Fourth Amendment protection. Anobile v. Pelligrino, 274 F.3d 45, 61 (2d Cir. 2001). It is

undisputed that the police entered and searched Mr. Grant's home without a warrant. There are two exceptions to the strict prohibition against searching a person's home without a warrant: exigent circumstances and consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (consent); Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971) (exigent circumstances). The Government has the burden of showing that the warrantless entry into Mr. Grant's home and the subsequent search of that home was proper by a preponderance of the evidence. See United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983).

The Government argues that the warrantless entry into and search of Mr. Grant's home conformed with the Fourth Amendment on two grounds:[1] the police received consent to enter an then to search, and the latter consent vitiated any illegal entry; and, as a fall-back position, that consent to enter should be implied. Both of these arguments are baseless.

The threshold question in this case is whether the police had consent to enter a private home without a warrant. A person is presumed to enjoy the greatest expectation of privacy in his home and thus the greatest Fourth Amendment protections. See Kyllo v. United States, 533 U.S. 27, 31 (2001) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own

home and there be free from unreasonable governmental intrusion.' With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.") (internal citation omitted)). The Government has come nowhere close to overcoming the presumption that a warrantless entry into a person's home is unreasonable. On this basis alone, the Court should suppress all of the evidence, both physical evidence and statements, obtained following the illegal entry into Mr. Grant's apartment.

The suppression inquiry should end here, and no further facts need be found by the Court, unless the Government can show that the taint of this illegal entry was attenuated from the seizure of the physical evidence and the obtaining of the statements from Mr. Grant. That is so because "[t]he normal result of such an illegal entry is to make unlawful any ensuing interrogations or searches." United States v. Vasquez, 638 F.2d 507, 527 (2d Cir. 1980) (internal citations omitted).

THE ENTRY TAINTED THE SEIZURE OF EVIDENCE

The Government may argue that the Court should nonetheless deny Mr. Grant's motion to suppress because the illegal entry was attenuated from the subsequent consents to search given, but the Court need not determine whether these consents were in fact given, because, even crediting the police version of events, *arguendo*, concerning what happened after the entry, the illegal entry tainted the seizure of the evidence and the obtaining of statements from Mr. Grant. Thus, the firearm, the drugs, and all statements must

be suppressed as fruits of the poisonous tree of the entry.

In Wong Sun v. United States, 371 U.S. 471, 484-87 (1963), the Court held that evidence indirectly obtained through a Fourth Amendment violation may be excludable as "fruit of the poisonous tree." Whether such evidence is in fact "fruit of the poisonous tree" turns on whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of primary taint." Id. at 487-88. The question of whether evidence has been purged of such a taint must be answered on the facts of each case, Brown v. Illinois, 422 U.S. 590, 603 (1975), and relevant factors include whether a Miranda warning has been given and waiver obtained prior to the seizure of the evidence, the temporal proximity of the illegal action and the contested evidence, the presence of intervening circumstances between the illegal action and the seizure of the evidence, and the purpose and flagrancy of the illegal misconduct. Id. at 603-04. The Government "bears the burden of proving a break in the causal chain" between the illegal entry and the seizure of evidence. United States v. Ceballos, 812 F.2d 42, 49-50 (2d Cir. 1987). The Government must show that any subsequent consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id. at 599; see also United States v. Thompson, 35 F.3d 100 (2d Cir. 1994). Contrary to the Government's possible position of the law, a giving of consent following an illegal entry cannot itself purge the search of taint; there must be an intervening circumstance that attenuates the consent from the

illegal act. See United States v. Guns, 921 F.2d 442, 447 (2d Cir. 1990) ("Under Wong Sun, the agents' illegal entry invalidates Guns' consent unless "the taint of the initial entry had been dissipated before the 'consents' to search were given.") (quoting Vasquez, 638 F.2d at 527).  "This ordinarily involves showing that there was some significant intervening time, space, or event." Vasquez, 638 F.2d at 528.  For example, in Wong Sun, the Court upheld the admissibility of a confession given days after the defendant had been released on his own recognizance following a lawful arraignment and voluntarily returned to the police station, events the Court held broke the causal chain with the initial illegal entry.  371 U.S. at 491.

Examination of the factors relevant to the determination of whether the taint of the illegal conduct was sufficiently diminished shows no causal break between the illegal entry into Mr. Grant's home and the alleged consents to and seizure of the evidence, even accepting, *arguendo*, the police version of events subsequent to the entry.

Second, it is uncontested that the drugs and gun were found and Mr. Grant answered the police questions regarding the drugs and gun within a few minutes of the illegal entry.  According to the police version of events, Mr. Grant gave consent to search immediately after the police entered his apartment. Thus, there was no intervening period of time between the illegal entry and the seizure of the physical evidence and questioning of Mr. Grant.

Third, the illegal misconduct here – three police officers entering a private home without permission – was flagrant, and the chief evil against which the Fourth Amendment protects.
Finally, even crediting, *argued*, the strongest police version of events for the Government, there was no intervening circumstance between the illegal entry and the seizure of the evidence. On the police version, Mr. Grant signed the consent to search form, gave statements, and the drugs and firearm were found within a "couple minutes" of the illegal entry. Between the illegal entry and the purported consents by Mr. Grant and obtaining of evidence, Mr. Grant spoke to no one other than the police officers, Mr. Grant was never told he could refuse to consent to search. connected in context and time to break the chain of illegality"); United States v. Ossify, 2003 WL 21018853, at *5 (S.D.N.Y.) (finding no attenuation where the consent was obtained only several minutes after the agents illegally entered the apartment).

In so asserting, the Government ignores the crux of the attenuation analysis: it is not whether consent was given, but what the circumstances of that consent were in relation to the illegal entry, specifically whether there was a break in causation between the illegal entry and the consent. The consents cannot themselves dissipate the taint, absent other intervening circumstances. See, e.g., Guns, 921 F.2d at 447 ("Under Wong Sun, the agents' illegal entry invalidates Guns' consent unless "the taint of the initial entry had been dissipated before the 'consents' to search were

given."); Ceballos, 812 F.2d at 50 (where consents to search were given within a few minutes of the illegal arrest, and defendant spoke to no one other than the agents, "the consents to search and the statements given were too closely connected in context and time to break the chain of illegality"); United States v. Karagozian, 715 F.Supp. 1160, 1166 (D. Conn. 1989) (finding consents to search were too closely connected in context and time to the illegal arrest to break the chain of illegality, where consent to search was given within a few minutes of the illegal action and nothing intervened to purge the taint of the illegal arrest).  Here, unlike in Guns, 921 F.2d 442, no circumstances intervened between the illegal entry and the purported volunteering of the evidence and signing of the consent form.  In Guns, the Court emphasized that prior to obtaining any evidence, the agent "deliberately read [defendant] his Miranda rights, stopping after each right to ensure that [the defendant] understood."  921 F.2d at 447.  Here, it is uncontested that the police did not inform Mr. Grant of his Miranda rights until hours after consent was purportedly given and the evidence had been seized.  Moreover, and perhaps most significantly, the consent form the defendant signed in Guns, unlike the form signed by Mr. Grant, clearly indicated his right to refuse consent to a search and demand a warrant, advised that any items found could be used against him, that he could consult an attorney before or during the search, and that he could withdraw his consent to search at any time prior to the conclusion.  See id. at 447-48 and fn. 1. The Second Circuit emphasized in Guns that

through the intervening act of giving the defendant this form, the agents "effectively advised Guns of his Fourth Amendment rights." 921 F.2d at 448. The same cannot be said of the form here or Officer Murphy's explanation of it to Mr. Grant, at issue here: there was no evidence that Mr. Grant was ever informed that he had the right to refuse to consent to a search, and the consent form does not so indicate. Any consent to search was too closely connected in context and time to the illegal entry to break the chain of illegality. Given that, all of the evidence, both physical evidence and statements, obtained by the police following the entry must be suppressed, because any "consent was tainted by the illegality and was ineffective to justify the search." Florida v. Royer, 460 U.S. 491, 507-08 (1983) (plurality opinion).

What is well-established is that NYPD officers do ignore the Fourth Amendment and then lie in court, particularly concerning the circumstances of searches for and seizures of evidence. This is hardly a new contention. In 1970, Frank S. Hogan, then the District Attorney for New York County, filed a brief in the New York State Court of Appeals in People v. Tate, decided sub nom People v. Berrios, 28 N.Y.2d 361 (1971), in support of challenges by five defendants to the admissibility of glassine envelopes in minor drug cases. In that brief, the prosecutor argued that police officers had long and often committed perjury when testifying at suppression hearings that defendants had dropped drugs to the ground, and that this false testimony was routinely given in order to use the "plain view" doctrine to justify street arrests of

people carrying concealed drugs. The United States Supreme Court has cited Berrios, recognizing "the apparent prevalence of police perjury" in the exclusionary area. Briscoe v. LaHue, 460 U.S. 325, 365 (1983); see also United States v. Janis, 428 U.S. 433, 447 and n. 18 (1976). Formal investigations into the NYPD have documented a continuing problem of police perjury in the exclusionary context. See Robert M. Pitler[2], Independent State Search and Seizure Constitutionalism: the New York State Court of Appeals; Quest for Principled Decision Making, 62 Brook. L. Rev. 1, 108-109 & n.410 (1996) (citing the Report of the Commission to Investigate Allegations of Police Corruption and the city's Anti-Corruption Procedures 71-89, 91-112, 116-20 (1972) (known as the Knapp Commission Report) and the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, 36-43 (1994) (the Mollen Commission Report). Indeed, some have gone so far as to say that "police officers routinely lie in the Fourth Amendment context." See Andrew McClurg, Good Cop, Bad Cop: Using Cognitive Dissonance Theory to Reduce Police Lying, 32 U.C. Davis L. Rev. 389, 400-01 (1999) (citing Sarah Barlow, Patterns of Arrests for Misdemeanor Narcotics Possession: Manhattan Police Practices 1960-62, 4 Crim. L. Bull. 549, 549- 50 (1968) (documenting the effect that Mapp had had on police perjury in New York). The Mollen Commission found that in New York, "the practice of police falsification ... is so

---

[2] Former Chief of Appeals Bureau, New York County District Attorney's office.

common in certain precincts that it has spawned its own word: 'testilying.' " See Gabriel Chin & Scott Wells, The "Blue Wall of Silence" as Evidence of Bias and Motive to Lie: a New Approach to Police Perjury, 59 U. Pitt. L. Rev. 233, 234; Christopher Slobogin, Testilying: Police Perjury and What To Do About It, 67 U. Colo. L. Rev. 1037, 1040-43 (finding that "the most common venue for testilying is the suppression hearing and the most frequent type of suppression hearing perjury is post hoc fabrication of probable cause.").

Being brought into federal court to testify at a suppression hearing does not appear to curb the NYPD's practice. Judges in this district repeatedly have found incredible the testimony of experienced NYPD officers concerning searches and seizures from "dime-a-dozen Bronx gun/drugs defendants." To name just a few recent examples in this district involving defendants represented by the Federal Defender Division, it is exactly what Judge Scheindlin found in United States v. Santos, 303 F. Supp. 2d 333 (S.D.N.Y. 2003), a case involving NYPD officers in the Bronx who had received a tip there was a gun in an apartment and went to that apartment, searched for the gun without consent, and then testified under oath that they had received consent. In holding that the police were not credible when they testified that they had received consent, Judge Scheindlin found that: "Determined to find the evidence they believed was in the apartment, the police simply ignored the rules." Id. at 335.  It is exactly what Judge Jones found in United States v. Boyce, 05 Cr. 27 (BSJ), another case

involving NYPD officers in the Bronx, who patted down a man on the street without probable cause to do so, seized a gun from him, and then came to court and, providing testimony rife with contradictions, claimed they had seen the man passing glassine envelopes from over one hundred feet away.  Judge Jones found herself "unable to credit the testimony of the two officers." See Tr. of Suppression Hearing, Mar. 18, 2005, at 123. It is what Judge Wood found in United States v. Rosa, 02 Cr. 1056 (KMW), another case involving NYPD officers in the Bronx going to a private home without a warrant, seizing a gun and drugs, and testifying in court that they had been invited to enter the apartment and take possession of the gun and drugs. It is what Judge Sprizzo found in United States v. Anthony Steele, 04 Cr. 429 (JES), where NYPD officers received a tip that the defendant had a gun in the closet of the apartment he was staying in, went to that apartment without a warrant, received consent to enter from another resident and then searched a locked closet and suitcases belonging to the defendant without his consent, testifying that although they forcibly took the keys to the locked closet from the defendant they believed the closet belonged to the resident who had given consent to enter.  Judge Sprizzo was unable to credit this story.  See Tr. of Suppression Hearing, Nov. 12, 2004, at 108-118.  It is what Judge Martin found in the final suppression hearing he conducted before stepping down from the bench, another case involving NYPD officers in the Bronx, who entered an apartment and searched it without consent, and then came to federal court and claimed that

the door to the apartment had sprung off its hinges when they tackled a suspect, they had seen "flame" inside (which turned out to be candlesticks), and went throughout the apartment to investigate this danger, resulting in their finding of the defendants, drugs, and a gun. Despite a telephone call to Judge Martin from United States Attorney James Comey stating that Mr. Comey "had carefully reviewed the matter with others in his office, that he was persuaded that the officers were not committing perjury, and that if there was any problem, he thought it was with the District Attorney," Judge Martin had "difficulty basing any finding on anything that the police officers said," and held that the testimony of the police officers was not credible. United States v. Laquan Grayson, 03 Cr. 281 (JSM), Tr. of Hearing, Sept. 26, 2003, at 2-3, 5.

As to the risks to the police, in none of the cases cited above, in all of which adverse credibility findings were made against law enforcement officers by federal judges, is defense counsel aware of any adverse consequence to the officers, not the loss of their jobs, not disciplinary action. For example, in a published decision, Judge Scheindlin found Police Officer Brennan "patently incredible" and Officer Mercado "not credible" on two distinct, significant points in Santos. To our office's knowledge neither of these officers was demoted or brought up on disciplinary charges.

The Government may argues that if the police officers were lying they would have cooked up a better, more consistent story.

Sometimes police officers do, but often, as in the examples cited above – a door springing off its hinges, flame inside – the police lies are facially preposterous.

In this case, as in the cases cited above, the defense respectfully submits that the police acted in pursuit of what they believed to be the greatest good – seizing a gun and drugs – but contrary to the Fourth Amendment and then tried to ensure that a criminal stayed in jail and smooth over their failure to follow the rules.

Whatever the officers' motives, whatever the risks to them, whatever their skills as liars, what is clear is that the Government has not met its burden in this case of proving that these officers' actions in entering and searching Mr. Grant's apartment conformed with the Fourth Amendment.

**CONCLUSION**

For all of the reasons set forth above, Mr. Grant respectfully submits that the Government has failed to meet its burden of proof, and that the physical evidence seized and statements obtained should be suppressed.

                                          Respectfully,

                                          /S/
                                          Roland Thau
                                          Staff Attorney
                                          (212) 417-8733

cc: Carrie H. Cohen, Esq., AUSA
    By ecf and fax 212 637-2937