UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :     07 Cr. 1119 (CM)

          - v. -                  :

RICHARD A. GRANT,                 :

          Defendant.              :

- - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW
### IN RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

### PRELIMINARY STATEMENT

The Government respectfully submits this Post-Hearing Memorandum of Law in further response to the defendant Richard A. Grant's motion to suppress. As the testimony of the officers who searched the defendant's apartment and then arrested him demonstrated, the defendant voluntarily let the police into his apartment and then gave them verbal and written consent to search his apartment for both guns and drugs.

The defendant testified to the contrary that he never consented to the search, and claimed to have signed the consent to search and written statement after the search under threats from the police that his son would be taken away from him if he did not cooperate with them. The defendant, however, has an extraordinary motive to lie in this case in order to stay out of jail and retain custody of his young son, which he fought a

protracted legal battle to obtain.  Accordingly, the defendant's testimony should not be credited.

Moreover, the officers' differing memories regarding whether the defendant informed the police that he had crack cocaine in his kitchen cabinet before or after they found the gun in his bedroom, does not bear on their credibility and in no way affects the validity of the search, as the defendant gave his consent to search his apartment for guns and drugs prior to the recovery of the gun.  The consensual nature of the search is further supported by the defendant's post-<u>Miranda</u> oral statements made the day after the search to Officer DeLeon in which the defendant reiterated that he had given the officers consent to search his apartment the day before and made no claim or mention of any misconduct, threats, or pressure by the arresting officers.

As the firearm, crack cocaine, marijuana, and drug related items were recovered in a consensual search of the defendant's apartment, and the defendant's post-<u>Miranda</u> statements were given freely and voluntarily, they all are properly admissible at trial and the defendant's motion to suppress should be denied in its entirety.

## THE SUPPRESSION HEARING

A.    The Search And Arrest

1.   Summary of the Officers' Testimony

At the suppression hearing, the Government called
Edward Murphy, formerly a Sergeant with the New York City Police
Department ("NYPD") and now an investigator with the Westchester
District Attorney's Office ("Sergeant Murphy") and Officer
Brendan Owens of the NYPD ("Officer Owens") to testify about the
search of the defendant's apartment on August 4, 2007, and the
defendant's subsequent arrest.[1]

According to Sergeant Murphy, on or about August 3, 2007,
the NYPD received information through its gun stop hotline that
an individual by the name of Richard Grant illegally possessed a
firearm in the bedroom of his residence, which was located at 835
East 221st Street, first floor apartment, Bronx, New York.  (Tr.
9-11, 60 and Government Exhibit ("Gov't Ex.") 3.)  Sergeant
Murphy explained that, in accordance with NYPD practice regarding
investigation of information obtained through its gun stop
hotline, Sergeant Murphy obtained a photograph and criminal
history of the individual named in the complaint and then

_____

[1]Neither party called NYPD Officer Thomas Stynes, who also was
present in the defendant's son's bedroom during the search of the
defendant's apartment and the defendant's subsequent arrest,
(Transcript of April 30, 2008 Hearing ("Tr.") 53), as a witness.

3

proceeded to the address at which the gun was reported to be located.  (Tr. 12, 52-53.)

Sergeant Murphy, Officer Owens, and Officer Stynes ("the Officers") arrived at the defendant's residence at approximately 10:20 p.m. on August 4, 2007.  (Tr. 13, 60.)  They arrived in plain clothes with police shields around their necks and traveled there in an unmarked police car without sirens or lights on. (Tr. 12-13, 60-61.)  The defendant's apartment was located in a three story private house.  (Tr. 13, 61.)  The front entrance to the house had a screen door behind which was a front door with three window panes near the top.  (Tr. 13.)

The Officers knocked on the door and announced themselves as Police Officers.  (Tr. 13, 61-62.)  There was one person (or perhaps two or more persons) on an outside balcony overlooking the front door who refused to let the Officers in the house. (Tr. 13, 61-62.)  Sergeant Murphy then rang a bell by the front door and continued to knock on the front door.  (Tr. 14; see Tr. 61.)  At that point, the defendant opened the door.  Sergeant Murphy and Officer Owens recognized the individual that opened the front door as Richard A. Grant, the defendant, because the individual matched the photograph of the defendant that Sergeant Murphy previously had obtained from the defendant's criminal history records.  (Tr. 14-15, 62.)

4

Sergeant Murphy testified that he told the defendant they were police officers and wanted to come in and talk to him. (Tr. 16.)[2] The defendant then let the Officers into the building and led them toward his apartment, which was down the hall from the front door on the first floor. (Tr. 16, 31, 63.) The defendant walked first down the hallway, with Sergeant Murphy, then Officer Owens, then Officer Stynes walking behind the defendant. (Tr. 16, 63, 81-82.)

When the defendant reached the door to his apartment, the defendant entered the apartment first and the Officers followed him into the apartment. (Tr. 16, 31, 63.) Sergeant Murphy could not recall whether the door to the defendant's apartment was open or closed, (Tr. 31), but Officer Owens recalled that the defendant opened the door although he could not recall whether the door was closed or partially ajar when the defendant opened it, (Tr. 63).

After the defendant let the Officers into his apartment, they all stood in the kitchen area and Sergeant Murphy asked if

---

[2]While Officer Owens recalled that Sergeant Murphy told the defendant that they wanted to talk to him while they were walking down the hallway from the front door of the house toward the door to the defendant's apartment, rather than when the defendant opened the front door to the house, (Tr. 62-64, 82-83), under either recollection as set forth below, the defendant was informed that the Officers wanted to talk to him before he let them into his apartment.

he could sit down to which the defendant replied yes.  (Tr. 17,
33-34, 83.)  Sergeant Murphy as well as the defendant then sat
down at the kitchen table and Sergeant Murphy testified that he
informed the defendant that the police had received information
that the defendant had a gun in his apartment.  (Tr. 17, 34.)
Officer Owens who, upon entering the apartment had conducted a
protective sweep of it, recalled being present in the kitchen for
this conversation.  (Tr. 64-65.)

Sergeant Murphy then asked the defendant if he had a gun in
the apartment, to which the defendant replied that he did not.
(Tr. 17.)  The defendant then said that the officers could search
his apartment and agreed to sign a written consent to that
effect.  (Tr. 17-18.)[3]  At that point, Sergeant Murphy informed
the defendant that he smelled marijuana.  (Tr. 18.)  While
Officer Owens did not testify about that comment, he did testify
that he recalled smelling marijuana upon entering the defendant's
apartment.  (Tr. 101.)[4]

Sergeant Murphy testifed that, as was his practice, after

---

[3]Officer Owens recalled that the defendant said he did not have a
gun but that it was fine with him to search the apartment
(without being explicitly asked if the officers could search).
(Tr. 65.)  Under either recall of events, the defendant gave oral
consent to the search directly after saying he did not have a
gun.

[4]The defendant admitted that he had smoked marijuana in his
apartment that night.  (Tr. 151.)

the defendant gave oral consent, he wrote out a written statement of consent on a page from a notepad and gave it to the defendant to read and sign.  (Tr. 18-21.)  After the defendant read the consent statement, he signed it and Sergeant Murphy and Officer Owens then signed it as witnesses. (Tr. 18-21, 66-67.)

The written consent stated that the defendant lived at 835 East 221st St., first floor, since August 2006 and stated that I, the defendant, "give the NYC Police Department permission to search my apartment for drugs and guns." (Gov't Ex. 1.)  The written consent was signed only about five minutes after the defendant let the Officers into his apartment.  (Tr. 20, 67.)

After the defendant gave oral and written consent to search his apartment, Officer Owens went to the defendant's bedroom to search for the weapon.  (Tr. 21, 68.)[5]  While Officer Owens was in the defendant's bedroom, Sergeant Murphy remained seated at the kitchen table with the defendant and Officer Stynes was in the defendant's son's room.  (Tr. 20-21, 23.)[6]

Officer Owens quickly found the firearm in a leather pouch inside a closet in the defendant's bedroom.  (Tr. 68.)  Officer

---

[5]The Gun Stop complaint stated that the firearm might be in the bedroom.  (See Gov't Ex. 3.)

[6]Sergeant Murphy had asked Officer Stynes to play with the defendant's son so that he would not hear the subject of the discussion between the police and his father.  (Tr. 53.)

Owens then came back into the kitchen and told Sergeant Murphy that he had found a firearm in the defendant's bedroom. (Tr. 22, 69.) At that point, Sergeant Murphy recalled asking the defendant if he had anything else in the apartment about which the police should know and the defendant stated that he had crack in the kitchen cabinet and pointed to the cabinet behind where they were sitting. (Tr. 22.) Sergeant Murphy testified that he then got up, searched that cabinet, and recovered the crack cocaine, a jar containing marijuana, and drug-related items, including glass jars and plastic baggies that he recognized as ones typically used to package drugs. (Tr. 22-23.)

Officer Owens recalled the order of these events slightly differently. Officer Owens testified that when he came back into the kitchen and informed Sergeant Murphy that he had found the gun in the defendant's bedroom, Sergeant Murphy told Officer Owens that the defendant already had told him that he had crack in a particular kitchen cabinet. (Tr. 69.) At that point, Sergeant Murphy searched that cabinet and found the drugs and drug related items. (Tr. 69-70.)

After the drugs were found, Sergeant Murhpy asked the defendant if he had a family member whom the defendant could call to take care of his son. (Tr. 23, 70.) The defendant then called his sister and the Officers waited in the defendant's

8

apartment until she arrived.  (Tr. 23-24, 71.)  While they were waiting for the defendant's sister to arrive, Sergeant Murphy saw marijuana and a pipe with marijuana residue in plain view on the defendant's living room table[7] and secured that evidence with the crack cocaine and drug related items.  (Tr. 24.)

After the defendant's sister arrived, Officer Owens took the defendant into the hallway right by the door to his apartment and handcuffed him.  (Tr. 24, 71, 73.)  Both Sergeant Murphy and Officer Owens stated that they did not handcuff the defendant before then because they did not want the defendant's son to see his father being arrested.  (Tr. 25, 72.)  The Officers then transported the defendant to the precinct where his arrest was processed.  (Tr. 25, 72.)

B.    The Defendant's Testimony

The defendant denied that the search of his apartment was consensual.  Rather, the defendant testified that on August 4, 2007, the doorbell to his apartment, which was located by the front door of the building, rang, but when he opened his apartment door to go to the front door, the Officers already were in front of his apartment door in the hallway.  (Tr. 141.) Sergeant Murphy told the defendant he wanted to talk to him and

---

[7]The defendant's kitchen and living room were not separated and were both in the same open area.  (Tr. 16, 64.)

then he "barged his way in" to the apartment.  (Tr. 141.)

Once in the apartment, Sergeant Murphy demanded that the defendant have a seat at the kitchen table.  (Tr. 142.)  After the defendant sat down, the two other officers immediately began searching the apartment, with Officer Owens going into the defendant's bedroom and the other officer going into the defendant's son's bedroom.  (Tr. 143-45.)  The defendant testified that, prior to the search, the Officers never asked for his consent to search, never asked him for identification, and also did not ask him if he had any guns or drugs.  (Tr. 146-47.)[8]

The defendant testified that, during the search, he asked Sergeant Murphy what the officers were doing and stated that they could not search his apartment without a warrant.  (Tr. 145.)  The defendant stated that Sergeant Murphy responded "shut up and sit down."  (Tr. 145.)  The defendant also testified that while he was seated in the kitchen, Sergeant Murphy was "interrogating" him, asking him questions about how long he lived in the apartment and about his son and his son's mother.  (Tr. 146-47.)

After Officer Owens found the gun in the bedroom and so

---

[8]While Officer Owens could not recall on cross-examination if the defendant showed any identification prior to signing the consent to search, (Tr. 91), the defendant's counsel did not ask Sergeant Murphy, the officer who was talking with the defendant in the kitchen, if the defendant showed him any identification prior to signing the consent to search.

informed Sergeant Murphy, the defendant testified that the officers searched the kitchen area and found the drugs.  (Tr. 146.)  The defendant testified that after the officers found the drugs, the officers threatened to call Child Protective Services unless he had someone who could come take his son.  (Tr. 146.)  It was at this point that the officers permitted the defendant to call his sister.  (Tr. 146.)

The defendant testified that he signed the consent to search, Government Exhibit 1, at the precinct after Sergeant Murphy threatened him that if he did not sign it, the police would call Child Protective Services and his son would be taken away from him.  (Tr. 148-49.)[9]

B.    The Defendant's Post-Miranda Statements

1.    Officer DeLeon's Testimony

The day after the defendant's arrest, at approximately noon, NYPD Officer Dannis DeLeon, who works with the NYPD's firearms division, arrived at the 46th Precinct with his partner NYPD Officer Roland Garcia.  (Tr. 104-05.)  Officer DeLeon explained that his division investigates all arrests involving illegal possession of firearms.  (Tr. 103-04.)  Officer DeLeon and

---

[9]Sergeant Murphy denied ever saying anything about Child Protective Services or what would happen to the defendant's son other than making arrangements at the defendant's apartment for the defendant's sister to come take care of the defendant's son. (Tr. 48-49.)

Officer Garcia removed the defendant from his cell and took him to another room to talk to him. (Tr. 105-06.) Officer DeLeon introduced Officer Garcia and himself, explained why they were there, and informed the defendant of his <u>Miranda</u> rights. (Tr. 106.)

Specifically, Officer DeLeon handed the defendant a written statement of his <u>Miranda</u> rights; read each right out loud to him; asked him if he understood each right; and asked him to put his reply, yes or no, next to the question and then initial his response. (Tr. 106-07.) After Officer DeLeon finished reading the defendant his <u>Miranda</u> rights and the defendant had responded "Yes" to each one with his initials, the defendant signed the document. (Tr. 106-09; Gov't Ex. 2 at 1.) After the defendant signed the document, Officer DeLeon signed it as did Officer Garcia. (Tr. 107.)

After the defendant was read his <u>Miranda</u> rights and waived those rights, Officer DeLeon questioned him. (Tr. 111.) In response to Officer DeLeon's questions, the defendant told Officer DeLeon, in relevant part, that he resided at the apartment at which he was arrested; that the officers had come to his residence the day before; knocked on the door; told him they had information that he had a gun; and asked him if he had a gun. (Tr. 112, 114.) Officer DeLeon testified that the defendant

12

told him that he had informed the Officers that he did not have a
gun; that the Officers asked if they could search his apartment;
that he said yes; and that then the police found the gun.  (Tr.
112, 114.)

Officer DeLeon testified that the defendant explained to him
that he had given consent to search his apartment because he
thought he no longer had the firearm in his apartment as he
believed that he had given it away.  (Tr. 112, 123.)  After the
gun was found, the defendant told Officer DeLeon that he had
informed the police that he had marijuana and cocaine in the
apartment and told them where it was located in the kitchen.
(Tr. 113.)

Officer DeLeon testified that he then asked the defendant if
he would write down what he had just stated orally to Officer
DeLeon and the defendant agreed to do so.  (Tr. 115.)  Officer
DeLeon asked the defendant to write on the back of the signed
waiver of the defendant's <u>Miranda</u> rights, and the defendant did
so.  (Tr. 116, Gov't Ex. 2 at 2.)

Other than informing the defendant, at his request, that he
should begin the statement with his name, where he got the gun,
and what happened the day before, Officer DeLeon did not give the
defendant any instructions or direction regarding what to write
and did not ask the defendant to change his written statement in

13

any way after he wrote it.  (Tr. 116-17, 134.)  While the written

statement is focused on the defendant's possession of the

handgun, how he got the handgun, and why he had the handgun,

(Gov't Ex. 2 at 2), such focus makes sense as Officer DeLeon

primarily was investigating the defendant's illegal possession of

the firearm, not the underlying facts surrounding the search.

After the defendant wrote his statement, the defendant signed it

as did Officer DeLeon. (Tr. 117; Gov't Ex. 2 at 2.)

Sergeant Murphy, Officer Owens, and Officer Stynes were not

present during Officer DeLeon's interview of the defendant nor

had Officer DeLeon seen the defendant's written consent to

search, Government Exhibit 1, prior to the interview and

subsequent written statement by the defendant.  (Tr. 125-27,

135.)  Neither party called Officer Garcia, who also was present

during the interview and statements of the defendant, as a

witness.

    B.    The Defendant's Testimony

The defendant testified that Officer DeLeon threatened him

that unless he "wr[o]te a confession," Child Protective Services

would take the defendant's son away from him.  (Tr. 152.)  The

defendant also testified that Officer DeLeon told him that he

knew that the defendant already signed such a document for the

14

NYPD and now needed to do so again for the "feds."  (Tr. 153.)[10]
The defendant admitted that he never told Officer DeLeon about
the alleged threats made by Sergeant Murphy regarding what would
happen if the defendant did not sign the consent to search
written by Sergeant Murphy.  (Tr. 153.)

   C.   The Defendant's Custody Of His Son

     The defendant testified that he engaged in extraordinary
efforts to obtain sole custody of his son from his son's mother
with whom he does not have a good relationship.  This custody
battle included the defendant initiating court proceedings for
DNA testing, which confirmed that he had fathered his son; the
defendant obtaining an amended birth certificate for his son on
which it stated that the defendant was his father; a two year
custody dispute at the end of which the defendant was awarded
sole custody of his son; and at least three temporary restraining
orders entered against the defendant in which he was ordered to
not to harass or physically endanger the mother of his son as
well as not possess a firearm.  (Tr. 139-40, 149, 162-63.)  The
defendant testified that he engaged in this protracted custody
battle because his son's mother is a "very troubled, addicted
woman" who also is "bipolar."  (Tr. 140.)

--------------------------------------------

[10]Officer DeLeon denied saying anything about Child Protective
Services or what would happen to the defendant's son.  (Tr. 118-
19.)

The defendant testified that even after his arrest for the charges and subsequent Indictment in this matter, he retains sole custody of his son and that his son continues to live with him while he is on bail pending trial.  (Tr. 161.)  The defendant further admitted that he wants to continue to retain sole custody of his son.  (Tr. 164.)

**ARGUMENT**

**I.  The Government's Witnesses Were Credible
And The Defendant Lied To Retain Custody Of His Son**

The testimony of the Government's witnesses and the testimony of the defendant were contradictory.  The defendant's testimony should be disregarded as not credible because it directly contradicts the testimony of three police officers who have no motive to lie while, in contrast, the defendant has extremely strong motives to lie.

A.    The Defendant's Motivation To Lie

While the defendant, like all defendants, has a motive to lie to suppress evidence and stay out of jail, staying out of jail for this defendant is even more important given his long, protracted court battle to obtain sole custody of his son and other statements that evidence his belief that his son's mother is not a suitable parent.  As defense counsel stated, "if anybody was eager not to be arrested, and perhaps imprisoned on, for God knows how long, it would be someone who had gone through all of

16

these steps to protect his son." (Tr. 139.)

As the defendant admitted on cross-examination, he currently has sole custody of his son and wants to continue to live with him. Accordingly, the defendant has more than the typical motive to lie, which is that failure to exclude the drugs and gun likely could lead to a lengthy prison term and loss of custody of his son. See, e.g., United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006) (declarant had "'an obvious motive to lie to protect his son'") (quoting from trial transcript).

In contrast, the defendant presented no evidence and did not ellicit any motive on cross examination as to why the officers would have acted in the abusive and outrageous manner as alleged by the defendant. The defendant's story requires the finder of fact to believe that two NYPD police officers independently engaged in the same type of egregious police misconduct.

The Government submits that it simply is not credible that Sergeant Murphy and Officer DeLeon, who did not work together and about which the hearing adduced no evidence of any type of collusion or collaboration, both independently engaged in the same type of serious police misconduct, e.g., obtaining consent and a written statement, respectively, by threatening the defendant that unless the defendant cooperated with the police, the police would report to the defendant to Child Protective

17

Services and he probably would lose custody of his son.[11] Accordingly, the defendant's testimony should be disregarded by the Court as it was not credible.

    B.    <u>The Officers' Testimony Was Credible</u>

The two witnesses presented by the Government who conducted the search of the defendant's apartment, Sergeant Murphy and Officer Owens, each explained the Gun Stop complaint that led to their visit to the defendant's apartment, the defendant's consent to the Officers' entry into his building and then apartment, the discussion prior to the defendant's consent to the search of his apartment, and the defendant's oral and written statement of consent to search. Both of these witnesses were internally consistent and, moreover, consistent in all material ways with each other.

While the officers' recollections about the details of certain events differed slightly in several respects, none of these differences should not have any adverse effect on the officers's credibility nor are the differences material to the

---

[11]Indeed, even assuming <u>arguendo</u> that, after smelling marijuana, finding crack cocaine, marijuana, and other drug-related items as well as a gun in the apartment in which the defendant resided with his son, the officers had an inclination to contact Child Protective Services, it simply makes no sense that they failed to do so while at the apartment rather than, as the defendant admitted, (Tr. 146), allowing the defendant to arrange for his sister to come for his son.

issue of consent.    For example, Sergeant Murphy recalled telling the defendant at the front door to the house, before the defendant let them into the hallway, that they wanted to talk to him, (Tr. 16), while Officer Owens recalled Sergeant Murphy so informing the defendant in the hallway while the defendant was leading them to his apartment, (Tr. 62-64, 82-83).  Such differing recollections are not significant, however, in the context of the issue at hand because under either scenario, the defendant was told <u>before</u> he let the officers into his apartment that they wanted to talk with him.  Moreover, both officers testified about a brief discussion outside the front door to the defendant's building and the walk down the hallway from the front door to the defendant's apartment took only a few seconds.  (<u>See</u> Tr. 50.)  Accordingly, their differing recollections are understandable and should not in any way reflect on their credibility.[12]

_____

[12]While the Civilian Compliant Review Board found Officer Owens's testimony regarding the search of passengers during a car stop more than ten years ago not to be credible, such finding has no bearing on whether Officer Owens gave credible testimony at the hearing in this case.  As set forth herein, Officer Owens testified at the hearing truthfully and the Court can assess his credibility from his testimony during the hearing as well as his demeanor on the witness stand.

## II.  **The Gun And Drugs Were Found After A Consensual Search**

The defendant claims that the gun and drug evidence found in his apartment should be suppressed because he did not give consent to the NYPD Officers to search his apartment.  The evidence adduced at the hearing, however, is to the contrary and thus his argument should be rejected.

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); see also Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so").  Consent, which may be express or implied, is a voluntary waiver of Fourth Amendment rights, and there is no requirement that law enforcement officers advise a defendant of his right to refuse consent, or of the possible consequences of a search, prior to seeking consent.  Schneckloth, 412 U.S. at 235, 241; United States v. Garcia, 56 F.3d 418, 422-23 (2d Cir. 1995).

To determine whether consent was voluntarily given, courts examine the totality of the circumstances surrounding the consent.  Schneckloth, 412 U.S. at 227; Anobile v. Pelligrino, 303 F.3d 107, 124 (2d Cir. 2004).  The factors used to determine

whether express consent is voluntary include the individual's knowledge of his right to refuse consent, his age, his intelligence and education, the length and the nature of questioning, or the presence of coercive police behavior. Schneckloth, 412 U.S. at 226-27.[13]  Generally, no one factor will be sufficient on its own to merit a finding of involuntariness. See id.

The evidence at the hearing showed that the defendant consented to the search of his apartment.  First, the defendant here is an educated and sophisticated adult who is well aware of his legal rights.  He received an honorable discharge from the United States Marines after serving from 1987-1991 in Japan. (Tr. 153.)  He also has extensive experience with litigation and the court system, having initiated a protracted custody battle against his son's mother.  (Tr. 139-40.)

Second, the questioning by the officers before the search was brief and limited to basic information about why they were there and whether the defendant had a gun in the apartment.  The officers did not coerce the defendant in any way, nor did they

---

[13]The fact that a defendant was not given Miranda warnings prior to giving consent to search is insufficient, without more, to render his consent involuntary.  See United States v. Moreno, 897 F.2d 26, 33 (2d Cir. 1990); Garcia, 56 F.3d at 422-23 (Miranda warnings not required, though absence of Miranda warnings "may be a factor" for consideration).

say anything to make the defendant believe he was under arrest before asking for consent to search.[14]

Moreover, the officers did not use any type of ruse or trickery to obtain consent. Rather, Sergeant Murphy simply told the defendant that the officers had information that he had a gun in the apartment, and asked the defendant if he had a gun. When the defendant denied having a gun in the apartment, Sergeant Murphy asked if they could search the apartment for the gun and the defendant said yes.

Third, the officers did not use any coercive police behavior. They were dressed in plain clothes; Sergeant Murphy sat down at the kitchen table to talk to the defendant; and one of the other two officers was playing with the defendant's son in another room while Sergeant Murphy was talking to the defendant. Accordingly, this is not a situation where, for example, numerous uniformed law enforcement officers surround the defendant and question him at length in an coercive atmosphere. See, e.g., Garcia, 56 F.3d at 423 ("presence of three law enforcement officers does not lend significant support to claim of

---

[14]While the Officers did not read the defendant his Miranda rights after they found the gun but before they asked him if he had anything else in the apartment, as noted above and discussed below, this factor is not sufficient to make his consent involuntary, given that all the other considerations suggest that the consent was knowing and voluntary.

coercion").

Finally, the defendant gave both oral and written consent for the officers to search the "my apartment" for "drugs and guns." (Gov't Ex. 1.) The fact that the written consent included drugs as well as guns makes perfect sense as the officers smelled marijuana in the apartment and the defendant admitted he had smoked marijuana that night in his apartment.

Accordingly, based on all of these factors, the Court should find the defendant voluntarily consented to the search of his apartment for drugs and guns.

### III.  Suppression Of The Drugs Is Not Required By <u>Miranda</u>, And, In Any Event, <u>The Drugs Would Have Been Inevitably Discovered</u>

The two witnesses presented by the Government who conducted the search of the defendant's apartment, Sergeant Murphy and Officer Owens, differed in their recollections of when the defendant informed them that he had crack in his kitchen cabinet. Sergeant Murphy testified that after Officer Owens returned to the kitchen and informed him that he had just found the gun in the defendant's bedroom, Sergeant Murphy asked the defendant if there was anything else in the apartment and the defendant told him there was crack in a particular kitchen cabinet. (Tr. 22.) Officer Owens recalled that after he returned to the kitchen and informed Sergeant Murphy that he had just found the gun in the

defendant's bedroom, Sergeant Murphy told him that while Officer Owens was in the bedroom, the defendant told him there was crack in a particular kitchen cabinet.  (Tr. 69.)

As a threshold matter, it is not surprising that Sergeant Murphy's and Officer Owens's respective memory of the order of events that happened nine months prior to the hearing - but not the significant fact that the defendant gave consent to look for drugs - differ.  Accordingly, this minor inconsistency in their testimony should in no way bear on their credibility. Nevertheless, as the Government bears the burden of persuasion on this issue, even viewing the facts in a light most favorable to the defendant - namely, Sergeant Murphy's recollection that the defendant admitted the location of the drugs after the gun already had been found in his bedroom - the drug evidence still should not be suppressed.

First, even assuming arguendo for purposes of the defendant's motion to suppress that the defendant was not free to leave after Officer Owens found the gun, the defendant's statement leading the officers to the drugs was voluntary and thus the drugs need not be suppressed.  A failure to give Miranda warnings does not violate a defendant's constitutional rights. See United States v. Patane, 542 U.S. 630, 641 (2004) (plurality opinion) (stating that the "mere failure to give Miranda warnings

does not, by itself, violate a suspect's constitutional rights or even the Miranda rule"); Chavez v. Martinez, 538 U.S. 760, 772-73 (2003) (explaining that Miranda warnings are not required by the Fifth Amendment; instead, the Fifth Amendment forbids the admission of coerced statements at trial, and Miranda is a safeguard to ensure that the right against compulsory self-incrimination is protected).

In Patane, the defendant was in custody when the officers attempted to advise him of his Miranda rights but got no further than the right to remain silent. 542 U.S. at 634. At that point, the defendant interrupted, asserting that he knew his rights, and neither officer attempted to complete the warning. Id. at 635. The officers then asked the defendant about whether he had a gun in his apartment and the defendant said that it was in his bedroom. The officers recovered the weapon, and the Government offered it at trial on charges for possession of a firearm by a convicted felon. Id.

The district and appellate court had held that the firearm was inadmissible, and the Supreme Court reversed. A majority of five Justices held that the firearm was admissible. A plurality opinion of three Justices reasoned that un-Mirandized testimonial statements are generally inadmissible in the Government's case-in-chief at trial because such statements would be akin to

compelling a defendant to testify against himself or herself at trial and would violate the Self-Incrimination Clause. Id. at 637-39.

In contrast, because the failure to give Miranda warnings does not violate a defendant's constitutional rights, physical evidence derived from a voluntary but un-Mirandized statement is admissible. Id. "The [Self-Incrimination] Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." Id. at 637. Therefore, the exclusionary rule and "fruit of the poisonous tree" doctrine articulated in Wong Sun v. United States, 371 U.S. 471, 488 (1963) does not apply. Patane, 542 U.S. at 637. See also United States v. Jackson, 506 F.3d 1358, 1361 (11th Cir. 2007) (interpreting Patane to mean that "Miranda does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement").

In this case, under the reasoning of Patane, the drugs and drug related items found in the defendant's apartment are admissible. In any event, even assuming arguendo that the drugs and drug related items recovered from the defendant's apartment could be suppressed as the fruit of a Miranda violation, the drugs and drug related items still are admissible because the officers inevitably would have discovered them based on the

26

defendant's written consent to search the apartment for drugs and guns.

According to the inevitable discovery doctrine, illegally-obtained evidence will not be suppressed if the government can prove that the evidence would have been inevitably discovered even without the constitutional violation. See United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002). "The inevitable discovery exception rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a 'later, lawful seizure' that is 'genuinely independent of an earlier, tainted one.'" Hudson v. Michigan, 547 U.S. 586, 616 (2006) (citing Murray v. United States, 487 U.S. 533, 542 (1988)). "Inevitable discovery" refers to discovery that would have occurred, or did occur, by lawful means, despite the unlawful behavior and independently of that unlawful behavior. Hudson, 547 U.S. at 616. In applying the inevitable discovery doctrine, the district court needs to determine "what would have happened had the unlawful search never occurred." United States v. Eng, 997 F.2d 987, 990 (2d Cir. 1993) (emphasis in original).

Here, the evidence at the hearing demonstrated that prior to the officers finding the gun and asking the defendant if he had anything else in the apartment, the defendant had consented to a

search his apartment for drugs and guns. Even after the gun was found, the defendant did not withdraw his consent to search. Accordingly, even if the defendant had not responded to the officers that he had crack in a particular kitchen cabinet, they would have found the drugs and drug-related items in their continued search of his apartment.

Moreover, the application of the inevitable discovery is especially appropriate where, as here, the officers smelled marijuana in the apartment, included the word "drugs" in the written consent to search, and saw marijuana and a pipe with marijuana residue in plain view. Such facts support a conclusion that, even if the arguably illegal search had not occurred, the drugs and drug related items would have been found and thus they should not be suppressed.

## **CONCLUSION**

For the reasons set forth above, defendant Richard A. Grant's motion to suppress should be denied in all respects.

Dated:    New York, New York
          May 6, 2008

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York


                    By:    /S/
                         _____
                         CARRIE H. COHEN
                         Assistant United States Attorney
                         Telephone: (212) 637-2264

<u>CERTIFICATE OF SERVICE</u>

CARRIE H. COHEN deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on May 6, 2008, she caused to be served a copy of the foregoing Government's Post-Hearing Memorandum of Law in Response to Defendant's Motion to Suppress by facsimile on:

> Roland Thau, Esq.
> Federal Defenders of New York
> 52 Duane Street, 10th Floor
> New York, New York 10007

I declare under penalty of perjury that the foregoing is true and correct.  Title 28, United States Code, Section 1746.

/S/ _____
CARRIE H. COHEN

Executed on: May 6, 2008
             New York, New York