UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :    07 Cr. 1119 (CM)

          - v. -                  :

RICHARD A. GRANT,                 :

          Defendant.              :

- - - - - - - - - - - - - - - - -x

### GOVERNMENT'S POST-HEARING PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW
### IN FURTHER RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

#### PRELIMINARY STATEMENT

The Government respectfully submits this Post-Hearing
Proposed Findings of Fact and Conclusions of Law in further
response to the defendant Richard A. Grant's ("the defendant")
motion to suppress.  As the testimony from the three on-scene
police officers demonstrated, the defendant, through his actions
and conduct, consented to the officers' entry into his apartment.
Once in the apartment, the testimony by the two officers who
participated in the search of the defendant's apartment further
demonstrated that the defendant gave verbal and written consent
to search his apartment for both guns and drugs.  Moreover, the
consensual nature of the entry and subsequent search is further
supported by the defendant's post-<u>Miranda</u> oral statements made
the day after the search in which the defendant reiterated that
he had given the police consent to search his apartment the day

before and made no claim or mention of any misconduct, threats, or pressure by the police officers.

The defendant's testimony to the contrary should not be credited; it was directly and consistently contradicted by all four police officers who testified at the hearing and the defendant here has an extraordinary motive to lie, namely to retain custody of his son, for which he fought a more than two-year protracted legal battle against his son's mother. Although the two officers who participated in the search of the defendant's apartment recalled the timing of when the defendant informed the police that he had crack cocaine in his kitchen cabinet, i.e., before or after the gun was found, such difference does not bear on their credibility and does not adversely effect the admissibility of the drug evidence.

Accordingly, the gun, drugs, and drug-related items all are properly admissible at trial and the defendant's motion to suppress should be denied in its entirety.

## PROPOSED FINDINGS OF FACT

At the suppression hearing held on April 30 and June 18, 2008, the Court heard testimony from the three police officers who went to the defendant's apartment on August 4, 2007: Edward Murphy, formerly a Sergeant with the New York City Police Department ("NYPD") and now an investigator with the Westchester

2

District Attorney's Office ("Sergeant Murphy"), NYPD Officer

Brendan Owens ("Officer Owens"), and NYPD Officer Joseph Stynes

("Officer Stynes") (collectively, the "Officers").  The Court

also heard testimony from NYPD Officer Dannis DeLeon ("Officer

DeLeon") about the defendant's post-<u>Miranda</u> oral and written

statements and the defendant testified on his own behalf.

    A.   <u>Background</u>

On or about August 3, 2007, the NYPD received information

through its gun stop hotline that an individual by the name of

Richard Grant illegally possessed a firearm in the bedroom of his

residence, which was located at 835 East 221st Street, first

floor apartment, Bronx, New York.  (Transcript of Hearing held on

April 30 and June 16, 2008 ("Tr.") 9-11, 60 and Government

Exhibit ("Gov't Ex.") 3. )  Sergeant Murphy explained that, in

accordance with NYPD practice regarding investigation of

information obtained through its gun stop hotline, Sergeant

Murphy obtained a photograph and criminal history of the

individual named in the complaint and then proceeded to the

address at which the gun was reported to be located.  (Tr. 12,

52-53.)

The Officers arrived at the defendant's residence shortly

after 10:00 p.m. on August 4, 2007.  (Tr. 12, 60.)  Officer

Stynes explained that the Officers went to the defendant's house

at night because they had a night tour of duty.  (Tr. 223.)  The Officers were dressed in plain clothes with police shields around their necks and arrived at the residence in an unmarked police car without its sirens or lights on.  (Tr. 13, 60-61, 223.)  The defendant's residence is a first floor apartment located in a two-three story house.  (Tr. 13, 61, 223.)

B.    The Consensual Entry Into The Defendant's Apartment

The defendant's gestures and conduct as consistently described by the Officers demonstrate that the defendant consented to their entry into his apartment.

When the Officers arrived at the defendant's residence, there were several individuals on an outside balcony overlooking the front door of the house.  (Tr. 13, 61, 223-24.)  The Officers identified themselves to such individuals as police officers and asked if they would open the front door and let the Officers inside the house.  (Tr. 13, 61-62, 224.)  The individuals refused to open the front door of the house for the Officers.  (Tr. 13, 62, 224.)

Sergeant Murphy then knocked on the front door of the house and rang a bell.  (Tr. 14, 61-62, 224.)  In response, the defendant came to the front door of the house and opened it. (Tr. 14, 61-62, 224.)  After the defendant opened the front door of the house, Sergeant Murphy identified himself and the other

4

officers as police officers and told the defendant that they "would like to come in and talk to him." (Tr. 16.)[1]

The defendant then let the Officers into the house and led them down the hallway toward his apartment, which was on the first floor about 10 feet from the front door of the house. (Tr. 16, 31, 63, 225.) The defendant walked first down the hallway, followed by Sergeant Murphy, then Officer Owens, and then Officer Stynes. (Tr. 16, 63, 81-82, 225.) Neither Sergeant Murphy nor Officer Stynes could recall whether the door to the defendant's apartment was open or closed, (Tr. 31, 226), but Officer Owens recalled that the defendant opened the door to his apartment although he could not recall whether that door was closed or partially ajar when the defendant opened it, (Tr. 63). Either way, the Officers consistently testified that the defendant entered the apartment first and the Officers followed the

---

[1]    While Officer Owens recalled that Sergeant Murphy told the defendant that they wanted to talk to him while they were walking down the hallway from the front door of the house toward the door to the defendant's apartment. (Tr. 62-64, 82-83.) Officer Stynes recalled the sequence of events similar to Sergeant Murphy's recollection except that after the defendant opened the front door of the house, he recalled that Sergeant Murphy spoke to the defendant in the area right behind the front door but could not recall the substance of the conversation except that the defendant acknowledged that he was Richard Grant. (Tr. 224-25, 233-34.) Under any of these recollections, however, the defendant was informed that the Officers wanted to come in and talk to him before he let them into his apartment.

5

defendant into the apartment in the same order as they had walked down the hallway toward the apartment.  (Tr. 16, 31, 63, 226.)[2]

C.   The Consensual Search Of The Defendant's Apartment

After the defendant let the Officers into his apartment, they were in the open kitchen area near the apartment entrance and Sergeant Murphy asked if he could sit down to which the defendant replied yes.  (Tr. 17, 33-34, 83.)  Sergeant Murphy as well as the defendant then sat down at the kitchen table and Sergeant Murphy informed the defendant that the police had received information that the defendant had a gun in his apartment.  (Tr. 17, 34.)  Sergeant Murphy asked the defendant if he had a gun in the apartment, to which the defendant replied

---

[2]   The defendant denied that the entry into his apartment was consensual.  Rather, the defendant claimed that in response to the ring of the door bell, which was located by the front door of the house, he opened his apartment door to go to the front door, but the Officers already were in front of his apartment door and Sergeant Murphy then "barged his way in."  (Tr. 141.)

Officer DeLeon's testimony that Officer Owens may have used the word "apartment door" when recounting the facts surrounding the defendant's arrest to Officer DeLeon, should be viewed in light of Officer DeLeon's other testimony that he did not know that the defendant's residence had two doors and thus assumed that when Officer Owens told him that the officers knocked on the defendant's door, it was the door to the defendant's actual apartment.  (Tr. 38-39, 48, 50.)  In any event, Officer DeLeon's somewhat confused memory of whether Officer Owens said door or apartment door highlights the need to rely on the testimony of the police officers with first hand knowledge regarding entry into the defendant's apartment, all of whom testified consistently that the defendant came to the front door of the house and let them in.

that he did not and gave Sergeant Murphy permission to search the apartment for the gun.  (Tr. 17-18, 65.)[3]

Pursuant to Sergeant Murphy's practice, after the defendant gave oral consent to search his apartment, Sergeant Murphy took out his notepad, "wrote out Mr. Grant's pedigree information," and then wrote the statement of consent.  (Tr. 18.)  Sergeant Murphy explained that such statement, Government Exhibit 1, was a copy of "the notepad that I made this – that I wrote Mr. Grant's pedigree information and the permission for us to search."  (Tr. 19.)

The written consent stated that the defendant lived at 835 East 221st St., first floor, since August 2006 and stated that I, the defendant, "give the NYC Police Department permission to search my apartment for drugs and guns."  (Gov't Ex. 1.)[4]  After the defendant read the consent statement, the defendant signed it

---

[3]    Officer Owens who, upon entering the apartment had conducted a protective sweep, recalled being present in the kitchen for this conversation.  (Tr. 64-65.)  Officer Stynes had, upon entry into the apartment and at Sergeant Murphy's request, gone into the defendant's son's bedroom to play with the son, and did not hear the discussion in the kitchen.  (Tr. 53, 226-27.)

[4]    The written consent included the defendant's consent to search for drugs because Sergeant Murphy, as well as Officer Owens, smelled marijuana in the defendant's apartment and, indeed, Sergeant Murphy asked the defendant if he had been smoking marijuana prior to signing the consent.  (Tr. 18, 101.) Moreover, the defendant admitted on direct that he had smoked marijuana in his apartment that night.  (Tr. 150.)

and then Sergeant Murphy and Officer Owens signed it as witnesses. (Tr. 18, 66-67.) The written consent was signed only about five minutes after the defendant let the Officers into his apartment. (Tr. 20, 67.)

In addition to the statement of consent, Government Exhibit 1 listed an address different from the defendant's residence as well as the defendant's New York State driver's license number and date of birth. (Gov't Ex. 1.) While Sergeant Murphy did not recall looking at the defendant's driver's license at the apartment, he testified that when he used the words "pedigree information," in connection with the written consent, Government Exhibit 1, he meant "the person's name, date of birth, and his address, height, weight, things like that," and that anything contained on Government Exhibit 1 would have been written by him in the defendant's apartment. (Tr. 213-14.)[5]

---

[5]    The defendant claimed that once in the apartment, Sergeant Murphy demanded that the defendant have a seat at the kitchen table and the two other officers immediately began searching the apartment, with Officer Owens searching the defendant's bedroom and Officer Stynes searching the defendant's son's bedroom. (Tr. 143-45.) The defendant also claimed that, prior to such search, the Officers never asked for his consent to search, never asked him for identification, and also did not ask him if he had any guns or drugs. (Tr. 146-47.)
    The defendant further claimed that he signed the consent to search, Government Exhibit 1, after his arrest at the precinct because Sergeant Murphy threatened him that if he did not sign it, the police would call Child Protective Services and his son would be taken away from him. (Tr. 148-49.)

After the defendant gave oral and written consent to search his apartment, Officer Owens went to the defendant's bedroom to search for the weapon. (Tr. 21, 68.)[6]  While Officer Owens was in the defendant's bedroom, Sergeant Murphy remained seated at the kitchen table with the defendant and Officer Stynes continued to play with the defendant's son in the defendant's son's bedroom. (Tr. 20-21, 23, 227.)

Officer Owens found the firearm in a leather pouch inside a closet in the defendant's bedroom and came back into the kitchen to tell Sergeant Murphy that he had found a firearm. (Tr. 22, 68-69.)  At that point, Sergeant Murphy asked the defendant if he had anything else in the apartment about which the police should know and the defendant stated that he had crack in the kitchen cabinet and pointed to the cabinet behind where they were sitting. (Tr. 22.)  Sergeant Murphy then searched that cabinet and recovered the crack cocaine, a jar containing marijuana, and drug-related items, including a digital scale, glass jars and plastic baggies that he recognized as ones typically used to

---

All of these allegations were directly contradicted by the Officers' testimony.

[6]    The Gun Stop complaint stated that the firearm might be in the bedroom. (See Gov't Ex. 3.)

package drugs.  (Tr. 22-23, 70.)[7]

After the drugs and drug related items were found, Sergeant Murphy asked the defendant if he had a family member whom the defendant could call to take care of his son.  (Tr. 23, 70.)  The defendant then called his sister and the Officers waited in the defendant's apartment until she arrived.  (Tr. 23-24, 71.)[8]

While they were waiting for the defendant's sister to arrive, Sergeant Murphy saw marijuana and a pipe with marijuana

_____

[7]    Officer Owens recalled the order of these events slightly differently.  Officer Owens testified that when he came back into the kitchen and informed Sergeant Murphy that he had found the gun in the defendant's bedroom, Sergeant Murphy told Officer Owens that the defendant already had told him that he had crack in a particular kitchen cabinet.  (Tr. 69.)  At that point, Sergeant Murphy searched that cabinet and found the drugs and drug related items.  (Tr. 69-70.)
    The defendant claimed that, during the search, he asked Sergeant Murphy what the officers were doing and stated that they could not search his apartment without a warrant to which Sergeant Murphy responded "shut up and sit down."  (Tr. 145.)  The defendant further claimed that while he was seated in the kitchen, Sergeant Murphy was "interrogating" him, asking him questions about how long he lived in the apartment and about his son and his son's mother until Officer Owens informed Sergeant Murphy that he had found the gun in the bedroom at which time the officers searched the kitchen area and found the drugs.  (Tr. 146.)  Sergeant Murphy's testimony contradicts such allegations.

[8]    The defendant claimed that after the police found the drugs, "they" threatened to call Child Protective Services unless he had someone who could come take his son.  (Tr. 146.)  It was at this point that the defendant claimed that "they" permitted the defendant to call his sister.  (Tr. 146.)

residue in plain view on the defendant's living room table[9] and secured that evidence with the crack cocaine and drug related items.  (Tr. 24.)  After the defendant's sister arrived, Officer Owens took the defendant into the hallway right by the door to his apartment and handcuffed him.  (Tr. 24, 71, 73.)  The defendant had not been handcuffed prior to that time because the Officers did not want the defendant's son to see his father being arrested.  (Tr. 25, 72.)  The Officers then transported the defendant to the precinct where his arrest was processed.  (Tr. 25, 72.)

D.    The Defendant's Post-Miranda Admissions

The day after the defendant's arrest, Officer DeLeon, whose responsibilities include investigating arrests involving firearms, and his partner NYPD Officer Roland Garcia ("Officer Garcia"), met with the defendant.  (Tr. 104-05.)  Officer DeLeon introduced Officer Garcia and himself to the defendant, explained why they were there, and informed the defendant of his Miranda rights.  (Tr. 106.)

Specifically, Officer DeLeon handed the defendant a written statement of his Miranda rights; read each right out loud to him; asked him if he understood each right; and asked him to put his

---

[9]    The defendant's kitchen and living room were not separated and were both in the same open area.  (Tr. 16, 64.)

11

reply, yes or no, next to the question and then initial his response. (Tr. 106-07.) After Officer DeLeon finished reading the defendant his <u>Miranda</u> rights and the defendant had responded "Yes" to each question and initialed his answers, including the last question in which the defendant agreed to waive his <u>Miranda</u> rights, the defendant signed the document. (Tr. 106-09; Gov't Ex. 2 at 1.) After the defendant signed the document, Officer DeLeon signed it as did Officer Garcia. (Tr. 107.)

After the defendant was read his <u>Miranda</u> rights and waived those rights, Officer DeLeon questioned him. (Tr. 111.) In response to Officer DeLeon's questions, the defendant told Officer DeLeon, in relevant part, that he resided at the apartment at which he was arrested; that the police officers had come to his residence the day before; knocked at his apartment; told him they had information that he had a gun; and asked him if he had a gun. (Tr. 112, 114.) The defendant told Officer DeLeon that the defendant had informed the police that he did not have a gun; that the police asked if they could search his apartment; that he said "yes;" and that the police then found the gun. (Tr. 112, 114.)

The defendant also told Officer DeLeon that the defendant had consented to the search of his apartment because he thought that he had given the firearm away so it no longer was in his

apartment.   (Tr. 112, 123.)   After the gun was found, the
defendant told Officer DeLeon that he had informed the police
that he had marijuana and cocaine in the apartment and told them
where it was located in the kitchen.   (Tr. 113.)   The defendant
also answered questions about the gun and how he came to possess
it.   (Tr. 111-13.)   At no time did the defendant claim that the
police has engaged in any type of misconduct or that they had
threatened him in any way, including the alleged threats
regarding what would happen if the defendant did not sign the
consent to search his apartment.   (Tr. 153.)

     After the defendant voluntarily made such admissions,
Officer DeLeon asked the defendant if he would write down what he
had just stated orally and the defendant agreed to do so.   (Tr.
115.)   Officer DeLeon asked the defendant to write on the back of
the signed waiver of the defendant's <u>Miranda</u> rights, and the
defendant did so.   (Tr. 116; Gov't Ex. 2 at 2.)

     Other than informing the defendant, at his request, that he
should begin the statement with his name, where he got the gun,
and what happened the day before, Officer DeLeon did not give the
defendant any instructions or direction regarding what to write
and did not ask the defendant to change his written statement in
any way after he wrote it.   (Tr. 116-17, 134.)   After the
defendant wrote his statement, the defendant signed it as did

Officer DeLeon. (Tr. 117; Gov't Ex. 2 at 2.)

In the written post-Miranda statement, the defendant again admitted that he consented to the search: "I did in fact givee [sic] officer the right to search the house." (Gov't Ex. 2 at 2.) The remainder of the written post-Miranda statement is focused on the defendant's possession of the handgun, how he got the handgun, and why he had the handgun, (Gov't Ex. 2 at 2), which focus makes sense as Officer DeLeon primarily was investigating the defendant's illegal possession of the firearm, not the underlying facts surrounding the entry into and search of the apartment and, indeed, he had made such purpose of his investigation clear to the defendant. (Tr. 106, 113.)[10]

## ARGUMENT

### I.  The Defendant Consented To Entry Into His Apartment

Based on the testimony of the police officers who went to the defendant's apartment, the defendant consented to their entry

---

[10]     The defendant claimed that, similar to the allegation he made against Sergeant Murphy, Officer DeLeon also threatened him that unless he "wr[o]te a confession," Child Protective Services would take the defendant's son away from him. (Tr. 152.) The defendant further claimed that Officer DeLeon told him that he knew that the defendant already signed such a document for the NYPD and now needed to do so again for the "feds." (Tr. 153.) Sergeant Murphy, Officer Owens, and Officer Stynes, however, were not present during Officer DeLeon's interview of the defendant nor had Officer DeLeon had any extensive discussions with them. (See Tr. 125-27, 134-35, 257.)

into his apartment.   While the defendant did not explicitly tell the Officers they could enter his apartment, the defendant's actions and conduct demonstrate his consent.

"[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981) (citation omitted); accord, United States v. Garcia, 56 F.3d 418, 424 (2d Cir. 1995) ("'consent . . . can be found from an individual's words, acts or conduct'") (citation omitted; ellipses in original).  Accordingly, "a search may be lawful even if the person giving consent does not recite the talismatic phrase: 'You have my permission to search.'"  Id.; see United States v. Camilo, 287 F. Supp. 2d 446, 451 (S.D.N.Y. 2003) ("valid consent need not be expressed through any particular phrase, and it 'can be found from an individual's words, acts or conduct'") (citation omitted).

Once consent is established, the government must show, by a preponderance of the evidence, that the consent was freely and voluntarily given.  See Schneckloth v. Bustamonte, 412 U.S. 218 (1973);  United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983).  In determining whether the consent was voluntary, courts examine the totality of the circumstances.  See Schneckloth, 412 U.S. at 227.

A.    The Defendant Gave Consent

Viewing the totality of these circumstances and the consistent testimony of the Officers on this issue, the Government has satisfied its burden of persuasion that the defendant consented to the Officers' entry into his apartment. The defendant had several opportunities to refuse entry and his repeated failure to do so combined with his conduct demonstrates his consent.

Initially, the defendant had ample opportunity to refuse entry at the front door to his house.  Indeed, it is undisputed that individuals on the balcony of the house engaged in exactly such conduct when they refused to open the front door and that such refusal did not result in any use or threat of force to gain entry.  (Tr. 13, 61-62.)

In contrast, the defendant voluntarily came to the front door, opened the front door, and did not close the front door upon seeing the Officers and learning that they wanted to come in and talk to him.  Rather, the defendant let the Officers into the hallway of the house and then led them down the hallway to his apartment.  Such "affirmative acts of cooperation" demonstrate that the defendant consented to the entry.  United States v. Rosi, 27 F.3d 409, 413-14 (9th Cir. 1994) (defendant consented to entry where agents suggested that they go inside defendant's

apartment and defendant did not answer but followed agents into the apartment) (citing United States v. Impink, 728 F.2d 1228, 1232 (9th Cir. 1984) ("courts will infer consent from the cooperative attitude of a defendant")); United States v. Garcia, 997 F.2d 1273, 1281 (9th Cir. 1993) (consent to enter implied where officers asked to talk to defendant, defendant said ok, and defendant stepped back thereby clearing way for officers to enter); see also Calvente, 722 F.2d at 1023 (2d Cir. 1983) (calm conversation and conversational tenor of discussion lend support to consensual entry).

The Tenth Circuit's opinion in United States v. Shaibu, 920 F.2d 1423 (10th Cir. 1989), on which the defendant relies, (Defendant's May 6, 2008 letter to the Court ("Def. Ltr. Br.") at 5-6), is inapposite. In Shaibu, the defendant stepped out of his apartment and walked down the hallway toward officers who had been let into the building. Id. at 1424. In the hallway, one of the officers asked Shaibu if a certain individual was in his apartment and Shaibu turned and walked back into his apartment at which point the officers followed Shaibu through his open apartment door. Id. In contrast, here, rather than simply follow the defendant through an open door, the Officers entered the defendant's apartment after a series of events had occurred, including the defendant's answering the front door to his

17

building, letting the Officers into the building, and leading the
officers down the hallway to his apartment after having been
informed by the Officers that they wanted to come in and talk to
him.  See Garcia, 56 F.3d 418, 424 (2d Cir. 1995) (criticizing
Shaibu and stating that Second Circuit precedent is to the
contrary and permits consent based on acts and conduct).
Accordingly, the defendant's actions at the front door and in the
hallway demonstrate consent to enter his apartment.

In addition, the defendant had subsequent opportunities to
refuse entry into his apartment, either while in the hallway or
outside the door to his apartment, and also failed to do so.
Similar to his conduct at the front door of the house, after the
defendant let the Officers enter the building, the defendant
neither said anything nor took any action to demonstrate his
desire that the Officers not enter his apartment.  Rather, the
defendant acted to the contrary:   The defendant walked first
into his apartment; did not close or attempt to close his
apartment door; and never told the Officers that they could not
enter or not to come in.[11]

---

[11]    Even crediting the defendant's allegations that he met the
Officers at the front door to his apartment and they "barged in,"
(Tr. 141), which the Court should not, the guns and drugs would
not necessarily be suppressed.  When a search follows an illegal
entry, the consent to the search may nevertheless be valid if
"the taint of the initial entry has been dissipated."  United

18

As the Eleventh Circuit explained in <u>United States</u> v. <u>Ramirez-Chilel</u>, 289 F.3d 744 (11th Cir. 2002), when a defendant does not give explicit verbal consent to enter but "yield[s] the right of way," such conduct demonstrates consent to enter. <u>Id</u>. at 751. The court in <u>Ramirez-Chilel</u> distinguished such facts from situations where a defendant's ability to consent is overwhelmed by a show of official authority such that the defendant's ability to consent is compromised. <u>Id</u>. (citing <u>United States</u> v. <u>Edmondson</u>, 791 F.2d 1512, 1515 (11th Cir. 1986) where officers surrounded apartment, drew their weapons, knocked on the door yelling "FBI. Open the door," and defendant opened the door, stepped back, and placed his hands upon his head)).[12]

Here, like in <u>Ramirez-Chilel</u>, the defendant did not simply

_____

States v. <u>Snype</u>, 441 F.3d 119, 132 (2d Cir. 2006). Here, assuming <u>arguendo</u> there was some taint from the Officers' entry into the defendant's apartment, it was dissipated by the "calm" conversation at the defendant's kitchen table during which Sergeant Murphy informed the defendant that they had information that he had a gun and asked for and received consent to search, both orally and in writing. <u>Id</u>. at 134-35.

[12]    <u>United States</u> v. <u>McCraw</u>, 920 F.2d 224 (4th Cir. 1990) on which the defendant relies, (Def. Ltr. Br. at 5), similarly is distinguishable as the officer in that case admitted during his testimony that after the defendant opened the door halfway, the officers had "forced our way in." <u>Accord</u> <u>United States</u> v. <u>Albrektson</u>, 151 F.3d 951, 954 (9th Cir. 1998)(officer admitted if defendant had not stepped to the side of the door, officers who had already begun to enter would have knocked defendant down); <u>United States</u> v. <u>Waupekenay</u>, 973 F.2d 1533, 1535-36 (10th Cir. 1992)(officers threatened to arrest defendant if she did not cooperate).

fail to object but rather consented to the Officers' entry into his apartment by letting them in the front door of the house, leading them down the hallway to his apartment, and then letting them into his apartment.  Accordingly, the defendant's conduct "yielding the right of way" demonstrates his consent.[13]

    B.    The Defendant's Consent Was Free And Voluntary

Viewing the totality of the circumstances, the defendant's consent was given freely and voluntary.  The Officers did not use any force or threat of force nor did they use any "trickery, fraud or misrepresentation" to gain entry into the defendant's apartment.  United States v. Griffin, 530 F.2d 739, 743 (7th Cir. 1976)(    ); see Garcia, 56 F.3d at 423 ("So long as the police do not coerce consent, search conducted on the basis of consent is not an unreasonable search.").

Rather, here, Sergeant Murphy told the defendant that the Officers would like to come in and talk to him and after the defendant let them in, he told the defendant the true reason for their visit.  In addition, the Officers dealt with the defendant in a "courteous" and "non-coercive manner" without "duress or show of force," and the questioning was brief.  United States v.

---

[13]Such consent to entry is further demonstrated by the defendant's failure to claim during his voluntary post-Miranda oral and written statements to Officer DeLeon that the officers had entered his apartment against his will.

Diaz, No. 96-1785, 2000 U.S. App. LEXIS 6312, at *5-6 (2d Cir. Apr. 5, 2000) (10-15 minutes of noncoercive courteous questioning supported finding that consent was voluntary).  Moreover, the defendant never made any claim of police conduct when he voluntary spoke to Officer DeLeon post-arrest.

The defendant's consent to enter his apartment thus was given voluntarily.

## II.   The Gun And Drugs Were Found After A Consensual Search

The defendant claims that the gun and drug evidence found in his apartment should be suppressed because he did not give consent to the Officers to search his apartment.  The substantial evidence adduced at the hearing, however, is to the contrary and thus his argument should be rejected.

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth, 412 U.S. at 219; see also Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so").  Consent, which may be express or implied, is a voluntary waiver of Fourth Amendment rights, and there is no requirement that law enforcement officers advise a defendant of his right to

refuse consent, or of the possible consequences of a search,
prior to seeking consent.  Schneckloth, 412 U.S. at 235, 241;
United States v. Garcia, 56 F.3d 418, 422-23 (2d Cir. 1995).

To determine whether consent was voluntarily given, courts
examine the totality of the circumstances surrounding the
consent.  Schneckloth, 412 U.S. at 227; Anobile v. Pelligrino,
303 F.3d 107, 124 (2d Cir. 2004).  The factors used to determine
whether express consent is voluntary include the individual's
knowledge of his right to refuse consent, his age, his
intelligence and education, the length and the nature of
questioning, or the presence of coercive police behavior.
Schneckloth, 412 U.S. at 226-27.[14]  Generally, no one factor will
be sufficient on its own to merit a finding of involuntariness.
See id.

The evidence at the hearing showed that the defendant
consented to the search of his apartment.  First, the defendant
here is an educated and sophisticated adult who is well aware of
his legal rights.  He received an honorable discharge from the
United States Marines and has extensive experience with

---

[14]    The fact that a defendant was not given Miranda warnings
prior to giving consent to search is insufficient, without more,
to render his consent involuntary.  See United States v. Moreno,
897 F.2d 26, 33 (2d Cir. 1990); Garcia, 56 F.3d at 422-23
(Miranda warnings not required, though absence of Miranda
warnings "may be a factor" for consideration).

litigation and the court system, having initiated a protracted custody battle against his son's mother.  (Tr. 139-40, 153.)

Second, the questioning by Sergeant Murphy before the search was brief and limited to whether the defendant had a gun in the apartment.  None of the Officers coerced the defendant in any way, nor did they say anything to make the defendant believe he was under arrest before asking for consent to search.[15]  The Officers did not use any type of ruse or trickery to obtain consent.  Rather, Sergeant Murphy simply told the defendant that the police had information that he had a gun in the apartment, and asked the defendant if he had a gun.  When the defendant denied having a gun in the apartment, Sergeant Murphy asked if they could search the apartment for the gun and the defendant said yes and also agreed to Sergeant Murphy's request for written consent.  (Tr. 18, 101, 150.)

Finally, the Officers did not use any coercive police behavior.  They were dressed in plain clothes, (Tr. 12, 60, 223); Sergeant Murphy sat down at the kitchen table to talk to the

---

[15]    While the defendant was not read his <u>Miranda</u> rights after the gun was found and before Sergeant Murphy asked him if he had anything else in the apartment, as noted above and discussed below, this factor is not sufficient to make the defendant's consent involuntary, especially given that all the other considerations demonstrate that his consent was knowing and voluntary.

defendant in  Officer Owens's presence except during the time
that Officer Owens conducted the protective sweep of the
apartment (Tr. 17, 33-34, 64-65, 83); and Officer Stynes was in
the defendant's son's bedroom playing with the son, (Tr. 226-27).
Accordingly, this is not a situation where, for example, numerous
uniformed law enforcement officers surround the defendant and
question him at length in an coercive atmosphere.  See, e.g.,
Garcia, 56 F.3d at 423 ("presence of three law enforcement
officers does not lend significant support to claim of
coercion").

Accordingly, based on all of these factors, the Court should
find the defendant voluntarily consented to the search of his
apartment for drugs and guns.

### III.  Suppression Of The Drugs Is Not Required By Miranda, And, In Any Event, The Drugs Would Have Been Inevitably Discovered

As voluntary statements made while in custody but without
Miranda warnings do not result in suppression of physical
evidence obtained as a result thereof, and, in the alternative,
the drugs and drug related items would inevitably have been
discovered, the defendant's motion should fail.

Sergeant Murphy and Officer Owens differed in their
recollections of when the defendant informed them that he had
crack in his kitchen cabinet.  Sergeant Murphy recalled that

after Officer Owens returned to the kitchen and informed him that he had found the gun in the defendant's bedroom, Sergeant Murphy asked the defendant if there was anything else in the apartment and the defendant told him there was crack in a particular kitchen cabinet.  (Tr. 22.)  Officer Owens recalled that after he returned to the kitchen and informed Sergeant Murphy that he had found the gun in the defendant's bedroom, Sergeant Murphy told him that while Officer Owens was in the bedroom, the defendant told him there was crack in a particular kitchen cabinet.  (Tr. 69.)

As a threshold matter, it is not surprising that Sergeant Murphy's and Officer Owens's respective memories differ regarding the timing of the defendant's disclosure of the location of the drugs, which events occurred nine months prior to the hearing, but not the significant fact that the defendant gave them consent to search the apartment for drugs.  In any event, such inconsistency in their testimony should in no way bear on their credibility.  Nevertheless, as the Government bears the burden of persuasion on this issue, even viewing the facts in a light most favorable to the defendant - namely, Sergeant Murphy's recollection that the defendant admitted the location of the drugs after the gun already had been found in his bedroom - the drug evidence still should not be suppressed.

A.  Nontestimonial Evidence Obtained From
    A Voluntary Post-Miranda Statement Is Admissible

First, even assuming _arguendo_ for purposes of the
defendant's motion to suppress that the defendant was not free to
leave after Officer Owens found the gun, the defendant's
statement leading to the seizure of the drugs and drug related
items was voluntary and thus the drugs and drug related items
need not be suppressed.  See United States v. Patane, 542 U.S.
630, 641 (2004) (plurality opinion) (holding that because the
"mere failure to give Miranda warnings does not, by itself,
violate a suspect's constitutional rights or even the Miranda
rule," evidence obtained as a result of voluntary statements made
without Miranda warnings being given does not need to be
suppressed as fruit of the poisonous tree); see also Chavez v.
Martinez, 538 U.S. 760, 772-73 (2003) (explaining that Miranda
warnings are not required by the Fifth Amendment; instead, the
Fifth Amendment forbids the admission of coerced statements at
trial, and Miranda is a safeguard to ensure that the right
against compulsory self-incrimination is protected).

In Patane, the defendant was in custody when the officers
attempted to advise him of his Miranda rights but got no further
than the right to remain silent.  542 U.S. at 634.  At that
point, the defendant interrupted, asserting that he knew his

rights, and neither officer attempted to complete the warning.
<u>Id</u>. at 635.  The officers then asked the defendant about whether
he had a gun in his apartment and the defendant said that it was
in his bedroom.  The officers recovered the weapon, and the
Government offered it at trial on charges for possession of a
firearm by a convicted felon.  <u>Id</u>.  The district and appellate
court had held that the firearm was inadmissible, and the Supreme
Court reversed.  A majority of five Justices held that the
firearm was admissible.  <u>Id</u>. at 637-39.

The Court explained that because the failure to give <u>Miranda</u>
warnings does not violate a defendant's constitutional rights,
physical evidence derived from a voluntary but un-<u>Mirandized</u>
statement is admissible.  <u>Id</u>.  "The [Self-Incrimination] Clause
cannot be violated by the introduction of nontestimonial evidence
obtained as a result of voluntary statements."  <u>Id</u>. at 637.
Therefore, the exclusionary rule and "fruit of the poisonous
tree" doctrine articulated in <u>Wong Sun</u> v. <u>United States</u>, 371 U.S.
471, 488 (1963) does not apply.  <u>Patane</u>, 542 U.S. at 637.  <u>See</u>
<u>also</u> <u>United States v. Jackson</u>, 506 F.3d 1358, 1361 (11th Cir.
2007) (interpreting <u>Patane</u> to mean that "<u>Miranda</u> does not require
the exclusion of physical evidence that is discovered on the
basis of a voluntary, although unwarned, statement").

In this case, under the reasoning of <u>Patane</u>, the drugs and

27

drug related items found in the defendant's apartment are admissible.

> ### B.   In The Alternative, The Drug Evidence Is Admissible Because It Inevitably Would Have Been Discovered

Even assuming arguendo that the drugs and drug related items recovered from the defendant's apartment could be suppressed as the fruit of a Miranda violation, the drug evidence still is admissible because the officers inevitably would have discovered it based on the defendant's written consent to search the apartment for drugs.

According to the inevitable discovery doctrine, illegally-obtained evidence will not be suppressed if the government can prove that the evidence would have been inevitably discovered even without the constitutional violation.  See United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002).  "The inevitable discovery exception rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a 'later, lawful seizure' that is 'genuinely independent of an earlier, tainted one.'"  Hudson v. Michigan, 547 U.S. 586, 616 (2006) (citing Murray v. United States, 487 U.S. 533, 542 (1988)).  "Inevitable discovery" refers to discovery that would have occurred, or did occur, by lawful means, despite the unlawful behavior and independently of that

28

unlawful behavior. <u>Hudson</u>, 547 U.S. at 616.  In applying the inevitable discovery doctrine, the district court needs to determine "what <u>would</u> <u>have</u> <u>happened</u> had the unlawful search never occurred."  <u>United States</u> v. <u>Eng</u>, 997 F.2d 987, 990 (2d Cir. 1993) (emphasis in original).

Here, the evidence demonstrates that prior to Officer Owens finding the gun and Sergeant Murphy asking the defendant if he had anything else in the apartment, the defendant had consented to a search his apartment for drugs and guns.  Even after the gun was found, the defendant did not withdraw his consent to search. Accordingly, even if the defendant had not told Sergeant Murphy that he had crack in a particular kitchen cabinet, the Officers would have found the drugs and drug-related items in their continued search of his apartment.

Moreover, the application of the inevitable discovery is especially appropriate where, as here, the officers smelled marijuana in the apartment, included the word "drugs" in the written consent to search, and saw marijuana and a pipe with marijuana residue in plain view after they had found the gun.[16]

---

[16]Accordingly, even though Officer Owens search of the defendant's bedroom was not extensive (because he quickly located the gun), the subsequent discovery of the marijuana and pipe, in particular, support the conclusion that a further search for other drugs would have been conducted.

29

Such facts support a conclusion that, even if the arguably illegal search had not occurred, the drugs and drug related items would have been found and thus they should not be suppressed.

### IV.  The Officers Were Credible And The Defendant Lied To Retain Custody Of His Son

The defendant's testimony should be disregarded as not credible:  It directly contradicts the testimony of the three police officers at the scene and another officer to whom the defendant confessed, all of whom have no motive to lie, while, in contrast, the defendant has extremely strong and extraordinary motive to lie, which is to retain custody of his son.

A.   The Defendant Had An Extraordinary Motive To Lie

While the defendant, like all defendants, has a motive to lie to suppress evidence and stay out of jail, staying out of jail for this defendant is even more important given his long, protracted court battle to obtain sole custody of his son and other statements that evidence his belief that his son's mother is not a suitable parent.  As defense counsel stated, "if anybody was eager not to be arrested, and perhaps imprisoned on, for God knows how long, it would be someone who had gone through all of these steps to protect his son."  (Tr. 139.)

As the defendant admitted on cross-examination, he engaged in extraordinary efforts to obtain sole custody of his son from

his son's mother with whom he does not have a good relationship. This custody battle included the defendant initiating court proceedings for DNA testing, which confirmed that he had fathered his son; the defendant obtaining an amended birth certificate for his son on which it stated that the defendant was his father; a two year custody dispute at the end of which the defendant was awarded sole custody of his son; and at least three temporary restraining orders entered against the defendant in which he was ordered to not to harass or physically endanger the mother of his son as well as not possess a firearm.  (Tr. 139-40, 149, 162-63.) The defendant engaged in this protracted custody battle because his son's mother is a "very troubled, addicted woman" who also is "bipolar."  (Tr. 140.)

Even after the defendant's arrest and subsequent Indictment in this matter, he retains sole custody of his son and his son continues to live with him while he is on bail pending trial. (Tr. 161.)  The defendant further admitted that he wants to continue to retain sole custody of his son.  (Tr. 164.) Accordingly, the defendant has more than the typical motive to lie, which is that failure to exclude the drugs and gun likely could lead to a lengthy prison term and loss of custody of his son.  See, e.g., United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006) (declarant had "'an obvious motive to lie to protect

31

his son'") (quoting from trial transcript).

In contrast, the defendant presented no evidence and did not ellicit any motive on cross examination as to why the officers would have acted in the abusive and outrageous manner as alleged by the defendant.  The defendant's story requires the Court to believe that two NYPD police officers independently engaged in the same type of egregious police misconduct.

Moreover, it simply is not credible that Sergeant Murphy and Officer DeLeon, who did not work together and about which the hearing adduced no evidence of any type of collusion or collaboration, both independently engaged in the same type of serious police misconduct, e.g., obtaining consent and a written statement, respectively, by threatening the defendant that unless the defendant cooperated with the police, the police would report to the defendant to Child Protective Services and he probably would lose custody of his son.[17]  Accordingly, the defendant's testimony should be disregarded by the Court as it was not credible.

---

[17]     Indeed, even assuming arquendo that, after smelling marijuana, finding crack cocaine, marijuana, and other drug-related items as well as a gun in the apartment in which the defendant resided with his son, the Officers were in any way inclined to contact Child Protective Services, it makes no sense that they failed to do so while at the apartment rather than, as the defendant admitted, (Tr. 146), allowing the defendant to arrange for his sister to come pickup his son.

B.    The Officers' Testimony Was Credible

Sergeant Murphy, Officer Owens, and Officer Stynes each explained the Gun Stop complaint that led to their visit to the defendant's apartment and the defendant's consent to their entry into his building and then apartment.  Sergeant Murphy testified about his discussion with the defendant prior to the defendant's consent to the search of his apartment, and he, as well as Officer Owens, testified about the defendant's oral and written statement of consent to search.  The testimony by these Officers was internally consistent and, moreover, consistent in all material respects.  In addition, their testimony is consistent with the defendant's admission to Officer DeLeon, orally and in writing, that he consented to the search of the apartment.  (Tr. 112; Gov't Ex. 2 at 2.)

While the Officers' recollections about the details of certain events differed slightly in several respects, none of these differences should not have any adverse effect on the officers's credibility nor are the differences material to the issue of consent.  For example, Sergeant Murphy recalled telling the defendant at the front door to the house, before the defendant let them into the hallway, that they wanted to talk to him, (Tr. 16), while Officer Owens recalled Sergeant Murphy so informing the defendant in the hallway while the defendant was

leading them to his apartment, (Tr. 62-64, 82-83), and Officer
Stynes recalled Sergeant Murphy talking to the defendant in the
hallway right behind the front door, (Tr. 224-25).  Such
differing recollections are not significant, however, in the
context of the issue at hand because under any of those
recollections, the defendant was told <u>before</u> he let the Officers
into his apartment that they wanted to talk with him.  Moreover,
all of the Officers testified about a brief discussion outside
the front door to the defendant's building or directly behind it
and then that the defendant led them down the hallway from the
front door to his apartment, which took only a few seconds.  (<u>See</u>
Tr. 50.)  Accordingly, their differing recollections are
understandable given the short time period of the discussion and
should not in any way reflect on their credibility.[18]

---

[18]   While the Civilian Compliant Review Board ("CCRB") found
Officer Owens's testimony regarding the search of passengers
during a car stop more than ten years ago inconsistent with other
testimony it had received, such finding has no bearing on whether
Officer Owens gave credible testimony at the hearing in this
case.  Similarly, the two substantiated CCRB complaints against
Officer Stynes, one of which contained no finding of
inconsistency but rather an understandable failure to recall,
have no bearing on whether Officer Stynes gave credible testimony
before this Court.  Both Officer Owens and Officer Stynes
testified at the hearing truthfully and the Court can assess
their credibility from their testimony during the hearing as well
as their demeanor on the witness stand.

## CONCLUSION

For the reasons set forth above, defendant Richard A.

Grant's motion to suppress should be denied in all respects.

Dated:    New York, New York
          July 2, 2008

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York


             By:    /S/
                    _____
                    CARRIE H. COHEN
                    Assistant United States Attorney
                    Telephone: (212) 637-2264

<u>CERTIFICATE OF SERVICE</u>

CARRIE H. COHEN deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on July 2, 2008, she caused to be served a copy of the foregoing Government's Post-Hearing Memorandum of Law in Response to Defendant's Motion to Suppress by hand on:

> Roland Thau, Esq.
> Attorney for Defendant
> Federal Defenders of New York
> 52 Duane Street, 10th Floor
> New York, New York 10007

I declare under penalty of perjury that the foregoing is true and correct.  Title 28, United States Code, Section 1746.

/S/_____
CARRIE H. COHEN

Executed on: July 2, 2008
             New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :
                                          07 Cr. 1119 (CM)
          - v. -                 :

RICHARD A. GRANT,                :

          Defendant.             :

- - - - - - - - - - - - - - - - x


**GOVERNMENT'S POST-HEARING PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
<u>IN FURTHER RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS</u>**


                                   MICHAEL J. GARCIA
                                   United States Attorney for the
                                   Southern District of New York
                                   One St. Andrew's Plaza
                                   New York, New York 10007

Carrie H. Cohen
Assistant United States Attorney
     -Of Counsel-

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .     iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . .     1

PROPOSED FINDINGS OF FACT . . . . . . . . . . . . . . . . .     2

    A.   Background . . . . . . . . . . . . . . . . . . .     3

    B.   The Consensual Entry Into
        The Defendant's Apartment . . . . . . . . . . . .     4

    C.   The Consensual Search Of
        The Defendant's Apartment . . . . . . . . . . . .     6

    D.   The Defendant's Post-<u>Miranda</u> Admissions . . . . . .     11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .     14

    I.   The Defendant Consented
       To Entry Into His Apartment . . . . . . . . . . .     14

        A.   The Defendant Gave Consent . . . . . . . . .     16

        B.   The Defendant's Consent
           Was Free And Voluntary . . . . . . . . . . .     20

    II.  The Gun And Drugs Were
       Found After A Consensual Search . . . . . . . . .     21

    III. Suppression Of The Drugs Is Not Required
       By <u>Miranda</u>, And, In Any Event,
       The Drugs Would Have Been Inevitably Discovered . .     24

        A.   Nontestimonial Evidence Obtained
           From A Voluntary
           Post-<u>Miranda</u> Statement Is Admissible . . . . .     26

        B.   In The Alternative, The Drug Evidence
           Is Admissible Because It
           Inevitably Would Have Been Discovered . . . .     28

    IV.  The Officers Were Credible And
       The Defendant Lied To Retain Custody Of His Son . .     30

        A.   The Defendant Had An
           Extraordinary Motive To Lie. . . . . . . . . .     30

        B.   The Officers' Testimony Was Credible . . . . .     33

CONCLUSION . . . . . . . . . . . . . . . . . . . .   35

## <u>TABLE OF AUTHORITIES</u>

<u>Anobile</u> v. <u>Pelligrino</u>,
303 F.3d 107 (2d Cir. 2004) . . . . . . . . . . . . . . . .  22

<u>Chavez</u> v. <u>Martinez</u>,
538 U.S. 760 (2003) . . . . . . . . . . . . . . . . . . . .  26

<u>Florida</u> v. <u>Jimeno</u>,
500 U.S. 248 (1991) . . . . . . . . . . . . . . . . . . . .  21

<u>Hudson</u> v. <u>Michigan</u>,
547 U.S. 586 (2006) . . . . . . . . . . . . . . . . . . . .  28

<u>Schneckloth</u> v. <u>Bustamonte</u>,
412 U.S. 218 (1973) . . . . . . . . . . . . . . . 15, 21, 22

<u>United States</u> v. <u>Albrektsen</u>,
151 F.3d 951 (9th Cir. 1998) . . . . . . . . . . . . . . .  19

<u>United States</u> v. <u>Buettner-Janusch</u>,
646 F.2d 759 (2d Cir. 1981). . . . . . . . . . . . . . . .  15

<u>United States</u> v. <u>Calvente</u>,
722 F.2d 1019 (2d Cir. 1983) . . . . . . . . . . . . . 15, 17

<u>United States</u> v. <u>Camilo</u>,
287 F. Supp. 2d 446 (S.D.N.Y. 2003). . . . . . . . . . . .  15

<u>United States</u> v. <u>Diaz</u>,
No. 96-1785, 2000 U.S. App. LEXIS 6312
(2d Cir. Apr. 5, 2000). . . . . . . . . . . . . . . . . 20-21

<u>United States</u> v. <u>Edmondson</u>,
791 F.2d 1512 (11th Cir. 1986). . . . . . . . . . . . . . .  19

<u>United States</u> v. <u>Eng</u>,
997 F.2d 987 (2d Cir. 1993) . . . . . . . . . . . . . . . .  29

<u>United States</u> v. <u>Garcia</u>,
56 F.3d 418 (2d Cir. 1995) . . . . . . . . 15, 18, 20, 22, 24

<u>United States</u> v. <u>Garcia</u>,
997 F.2d 1272 (9th Cir. 1993). . . . . . . . . . . . . . .  17

<u>United States</u> v. <u>Griffin</u>,
530 F.2d 739 (7th Cir. 1976) . . . . . . . . . . . . . . .  20

iii

<u>United States</u> v. <u>Jackson</u>,
506 F.3d 1358 (11th Cir. 2007). . . . . . . . . . . . . . . 27

<u>United States</u> v. <u>Mendez</u>,
315 F.3d 132 (2d Cir. 2002). . . . . . . . . . . . . . . . 28

<u>United States</u> v. <u>Moreno</u>,
897 F.2d 26 (2d Cir. 1990). . . . . . . . . . . . . . . . . 22

<u>United States</u> v. <u>McCraw</u>,
920 F.2d 224 (4th Cir. 1990). . . . . . . . . . . . . . . . 19

<u>United States</u> v. <u>Patane</u>,
542 U.S. 630 (2004). . . . . . . . . . . . . . . . . . . . 19

<u>United States</u> v. <u>Paulino</u>,
445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . . . 31

<u>United States</u> v. <u>Ramirez-Chilel</u>,
289 F.3d 744 (11th Cir. 2002) . . . . . . . . . . . . . . . 19

<u>United States</u> v. <u>Rosi</u>,
27 F.3d 409 (9th Cir. 1994). . . . . . . . . . . . . . . . 16

<u>United States</u> v. <u>Shaibu</u>,
920 F.2d 1423 (10th Cir. 1989) . . . . . . . . . . . . . . 17

<u>United States</u> v. <u>Snype</u>,
441 F.3d 119 (2d Cir. 2006) . . . . . . . . . . . . . . 18-19

<u>United States</u> v. <u>Waupekenay</u>,
973 F.2d 1533 (10th Cir. 1992). . . . . . . . . . . . . . . 19

<u>Wong Sun</u> v. <u>United States</u>,
371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . 27