UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

UNITED STATES OF AMERICA            :

          - v -                     :    **S1 07 Cr. 1119(CM)**

**RICHARD GRANT,**                  :
                    Defendant.
--------------------------------X


**RICHARD GRANT'S POST-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS**


                              LEONARD F. JOY, ESQ.
                              The Legal Aid Society
                              Federal Defender Services Unit
                              Attorney for Defendant
                                **Richard Grant**
                              52 Duane Street -10th Floor
                              New York, New York  10007
                              Tel.: (212) 417-8733


**ROLAND THAU, ESQ.**

    Of Counsel

TO:    **CARRIE COHEN**, ESQ.
       United States Attorney
       Southern District of New York
       One St. Andrew's Plaza
       New York, New York  10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

UNITED STATES OF AMERICA          :

          - v -                   :          **S1 07 Cr. 1119 (CM)**

**RICHARD GRANT,**                :
                    Defendant.
-------------------------------X


**RICHARD GRANT'S PROPOSED FINDINGS OF FACT AND CON-
CLUSIONS OF LAW IN SUPPORT OF HIS MOTION TO SUP-
PRESS**

### PRELIMINARY STATEMENT

Richard Grant stands indicted for a violation of 18
U.S.C.922(g)(8), possession of a firearm while under an order
of protection in Count I and with a  violation of 21 U.S.C.
812, 841(a)(1), and 841(b)(1)(B) with possession of "crack"
cocaine in Count II, all based on warrantless seizures made by
the police in his apartment in the late evening of August 4,
2007 and postarrest statements by him.


Mr. Grant brought a motion to suppress all the physical
evidence seized by the police as well as statements allegedly
made by him on the grounds that the police entered his apart-
ment, searched it, and seized physical evidence, all without a
warrant or his consent to the entry of his apartment or its

1

search and allegedly conducted a postarrest non-Mirandized interrogation yielding an incriminating statement which led to a second seizure of physical evidence.

The court held and evidentiary hearing at which four New York City police officers and Mr. Grant all testified and admitted a number of exhibits.

**The hearing was conducted over three days, April 20, May 7 and June 18, 2008. The three transcripts originally produced each started with page #1 and this submission was well underway when the court reporter's office sent us a revised transcript for June 18 which starts at page 211, suggesting that the May 7th transcript may have been similarly repaginated, to start at page 169 and ending at page 210. Because of this late renumbering, this submission follows the original version of the transcripts; we identity the passages we quote or para-phrase as coming from "Tr1" for April 20, "Tr2" for May 7 and "Tr3" for June 18.**

The parties had previously submitted legal memoranda addressing a number of issues.   In the interest of brevity and economy, we incorporates herein by reference our previously made oral and written arguments.


**PROPOSED FINDINGS OF FACT**

**This case is anomalous because, notwithstanding significant differences and contradictions  between Mr. Grant's testimony and that  of the police, we propose that suppression**

2

should be granted on the police' own version of the events; a version which we vigorously dispute, urging the Court to credit Mr. Grant's testimony in its entirety.

1.  In  The police entered Mr. Grant's apartment without a warrant and without his expressed or implied consent.

2.  Mr. Grant did not consent to a search of his apartment.

3.  Mr. Grant did not tell the police that he had drugs in his kitchen.

4.  There were no intervening temporal events between he police Entry into the apartment and Mr. Grant's alleged consent to its search.

5.  Government's <u>Exhibit 1</u>, the alleged consent to search his apartment, was not prepared by the police and executed by Mr. Grant in his apartment before the police searched it but was prepared and executed elsewhere and after the search had been completed.

6.  The relevant scenario did not create exigent circumstances, nor would the drugs have been "inevitably discovered".

**WHY CREDIT ME. GRANT'S TESTIMONY RATHER THAN THE POLICE'S?**

Mr. Grant's testimony was simple, direct and trustworthy. The events were more memorable to him than they ever could be to the police officers since, to him,  they were dramatic, frightening and unique while to the police, they were

3

routine.

Very quickly stated, Mr. Grant testified on August 4, 2007, he lived alone would is now-three-year-old son born to a former girlfriend who had caused another man to appear in the child's birth certificate has the father and that Mr. Grant had established paternity through the courts, over the child's mother's objections and had the child's birth certificate changed to reflect his own paternity and then sued successfully for exclusive custody of the child because its mother was addicted, had emotional problems and was unfit to care for the boy.     Documentary evidence of these poignant facts were not contested by the government and were received in evidence in addition to proof that Mr. Grant served honorably in the United States Marines.

Mr. Grant also testified that the night of his arrest, the police came to his apartment door and barged in without asking him for his permission to enter, searched his apartment without asking for his permission to do so, arrested him and later, at the police station, if coerced him into signing Govt. Exhibit 1 (the ostensible consent to search) by telling him that unless he did so, a child protection service agency would be contacted and he would lose his child.

The government argues that Mr. Grant committed perjury in order that this Court grant his motion to suppress, so that he might avoid conviction, not go to jail and continue being the devoted and passionate father he has shown himself to be.

Indeed, the government argues that Mr. Grant's devotion to his child creates a more compelling and additional motive than most defendants usually have to commit perjury.  As this court pointed out during oral argument May 7, 2008, Mr. Grant's fervent desire to not lose the child would just as well support the argument that this father had and additional reason than most people to not consent to the police entering his apartment and searching it.   Ironically, the government would turn Mr. Grant's virtues as an adoring and protective father into a motive to commit perjury, ignoring completely the flipside proposition that such a man (whose intelligence the government concedes) would deny consent for the very same reasons.

Mr. Grant had nothing whatever to gain tactically by denying the police's account of what occurred in the hallway of his building because the police's account of what happened there did not support a conclusion that he had expressly or impliedly agreed of the police might enter his apartment.   He testified as he did because his testimony reflected his honest recollection, understanding full well that it is wise to contradict the police as little as possible.

Another indicia of Mr. Grant's candor is to be found in his testimony that he had been smoking marijuana in his apartment the evening of his arrest.   That testimony would tend to lend support to the inclusion of the reference to drugs in government Exhibit 1.   Had he denied having recently smoked marijuana, that inclusion in the exhibit would have further

5

advanced our argument that the document had not been prepared and executed in the apartment before the search ,but rather, later on at the police precinct.

In stark contrast, the police testimony was riddled with inconsistencies, contradictions and improbabilities.  The government relies on Government Exhibit 1 as evidence that Mr. Grant had given oral consent to search his apartment while sitting at his  kitchen table with officer Murphy, that Murphy had then written the text of the document which Grant had signed, following which officer Owens had gone into Mr. Grant's bedroom and retrieved a firearm. Curiously, indeed most suspi-ciously, the document recites not only Mr. Grant's then-current address but a former address and his drivers license number although the evidence (from all those who testified) is that no documents were produced or examined by the police in the apartment.

The officers' vague and contradictory accounts of how they entered Mr. Grant's apartment should not be credited. Sgt. Murphy stated that while he was standing with Mr. Grant at the front door of Mr. Grant's building he informed Mr. Grant that he would "like to come in and talk to him." Hearing Transcript from April 30, 2008 ("Tr1.") 16. Neither PO Stynes nor PO Owens specifically recalled Sgt. Murphy making such a statement to Mr. Grant. See Tr1. 80; Hearing Transcript from June 18, 2008 (Tr3.) 14. During direct examination, PO Owens stated that, while standing at the door to Mr. Grant's building, Sgt. Murphy

6

asked Mr. Grant to identify himself and asked Mr. Grant if he
could talk to him. During cross examination, PO Owens contra-
dicted his previous testimony and stated that he could not
recall anything Sgt. Murphy said to Mr. Grant before walking
into the hallway inside of Mr. Grant's apartment building. Tr1.
80. Though Sgt. Murphy testified that he had no conversation
with Mr. Grant inside of the hallway, PO Owens testified that
Sgt. Murphy asked Mr. Grant if the officers could enter his
apartment. Tr1. 50, 63. PO Owens further testified that Mr.
Grant responded to Sgt. Murphy's question by saying, "yes, you
can," opening the door to his apartment, and gesturing with his
hand for the officers to enter. Tr1. 63. Despite obvious incen-
tives to recall any such statements or actions, neither Sgt.
Murphy nor PO Stynes reported that Mr. Grant explicitly invited
the officers into his apartment. See Tr1. 16, 50; Tr3. 15. Both
Sgt. Murphy and PO Stynes testified that they simply followed
Mr. Grant down the hallway and into his apartment without being
explicitly invited in. Tr1. 16; Tr3. 15. As a result, it is
clear that PO Owens' account of how the officer's entered Mr.
Grant's apartment cannot be credited as a likely version of the
truth. At the same time, Sgt. Murphy's account of how he gained
entry into Mr. Grant's apartment is largely uncorroborated and
is of doubtful veracity in light of his other statements.

Sgt. Murphy and PO Owens undermined their own credibility
by fabricating their accounts of how Sgt. Murphy obtained con-
sent to search Mr. Grant's apartment. Sgt. Murphy and PO Owens

both testified that after they entered Mr. Grant's apartment
Sgt. Murphy sat down at Mr. Grant's kitchen table with Mr.
Grant. Tr1. 17, 66. The two officers testified that Mr. Grant
then gave verbal consent to search and voluntarily signed a
statement of consent that Sgt. Murphy wrote out for him. Tr1.
17, 66. It is, however, clear that the statement of consent was
not written out and signed inside Mr. Grant's apartment.

     The pedigree information contained within the statement
indicates that Sgt. Murphy wrote out the statement at the sta-
tion house while PO Owens was processing Mr. Grant's arrest.
This is because the statement contains three highly unusual
pieces of pedigree information: Mr. Grant's middle initial, Mr.
Grant's previous address and Mr. Grant's driver's license num-
ber. This is the kind of information that would normally be
obtained from someone's driver's license. Nevertheless, Sgt.
Murphy never testified that he obtained Mr. Grant's driver's
license while inside Mr. Grant's apartment. Tr1. 17-20. When
directly questioned about the matter, Sgt Murphy claimed that
he could not recall how he obtained Mr. Grant's pedigree infor-
mation. Tr3. 3. Even though PO Owens was supposedly standing
next to Sgt. Murphy when Sgt. Murphy wrote out the statement,
PO Owens could not explain how Sgt. Murphy obtained Mr. Grant's
pedigree information. Tr1. 88. When asked if Sgt. Murphy asked
Mr. Grant for any written pedigree documentation, PO Owens
said, "I – I don't remember that, Sergeant Murphy asking; no,
sir, I don't remember that. I don't remember if he did." Tr1.

90. When asked to clarify his answer, PO Owens read over the
written statement and then observed that "it had a New York
State driver's licensee number" on it and that "in order to get
that" Sgt. Murphy would have needed to have had access to Mr.
Grant's driver's license. Tr1. 91. PO Owens then testified that
he did not recall Sgt. Murphy asking for or being shown Mr.
Grant's identification inside the apartment. Tr1. 91. This
makes perfect sense given the fact that Mr. Grant's identity
was never in question. In fact, Sgt. Murphy testified that he
instantly recognized Mr. Grant when he first encountered him
because he had obtained a photo of Mr. Grant from a police
department database. Tr1. 12. Consequently, Sgt. Murphy had no
reason to ask Mr. Grant for identification inside the apart-
ment. It is, therefore, highly unlikely that the statement was
actually written inside Mr. Grant's apartment or that Mr. Grant
ever gave consent for his apartment to be searched.

Instead of crediting the problematic testimony of Sgt.
Murphy and PO Owens, the court should credit Mr. Grant's ac-
count of how and when he gave the officers consent to search
his apartment. Mr. Grant testified that the officers never
asked for his consent to search his apartment and he testified
that he never gave the officers consent to search his apart-
ment. Tr1. 145, 147. Mr. Grant maintained that he signed the
statement of consent at the stationhouse because Sgt. Murphy
threatened to notify the appropriate agency and have Mr. Grant-
's only son taken away from him. Tr1. 148. Sgt. Murphy could

9

have easily obtained Mr. Grant's driver's license at the station house after it was sized during a search pursuant to Mr. Grant's arrest. Sgt. Murphy was also well aware of Mr. Grant's family circumstances because he had to wait inside Mr. Grant's apartment for Mr. Grant's sister to arrive for take care of Mr. Grant's son. Tr1. 24. As a result, Mr. Grant's account of how the statement was signed is entirely plausible and should be credited.

Despite the less than credible testimony of PO Deleon, Mr. Grant had no incentive to allow the officers to enter or search his apartment. PO Deleon stated that Mr. Grant informed him that he had given the officers permission to search his apartment because he believed that he had given the gun away. Tr1. 112. This potentially plausible explanation for why a person might mistakenly consent to a search is simply not a reasonably explanation for why Mr. Grant might have given his consent. At the time of the incident, Mr. Grant was living with his less than three year old son. Tr1. 137. Though he faced opposition from his son's mother, Mr. Grant successfully established his paternity by means of DNA testing and then attained sole custody of the boy. Tr1. 139-140. Given this fact, Mr. Grant had every reason to prevent officers from searching his home. Tr1. 112. Moreover, Mr. Grant testified that he was aware of the fact that he had both the gun and the drugs inside his apartment. Tr1. 137. Like any proud father and reasonable man, Mr. Grant had no desire to lose custody of his

son or to go to jail. Tr1. 149. As a result, he had no incentive to invite the officers into his home because this would give them the opportunity to easily smell the marijuana. Similarly, he had no reason to consent to having his home searched because this would enable the officers to discover the crack. Though PO Deleon provided a would-be clever explanation for why another person might have allowed the officers to enter and search, it is clear that PO Deleon's testimony does not explain why Mr. Grant might have consented to an entry or a search even if he believed that he had given the gun away which, of course, he denied believing or telling SeLeon any such thing.

The court should, therefore, credit Mr. Grant's account of how the officers entered and searched his apartment without his consent. Mr. Grant testified that he heard the doorbell connected to the outer door of his building ring and then went to answer the door. Tr1. 141. He was, however, surprised when he opened the interior door that leads into his apartment and found that the officers were already inside the building and standing at his door. Tr1, 141. This is not an implausible version of events because not one of the officers testified that the exterior door of Mr. Grant's building was actually locked. See Tr1. 13, 61; Tr3. 13. The officers testified that they asked individuals on the second floor balcony of the building to let them in, but they refused. Tr1. 13, 61; Tr3. 13. The officers stated that they then knocked on the door and

rang the doorbell, but no one responded immediately. Tr1. 14, 61 Tr3. 13-14. Under the circumstances, it is likely that the officers simply became impatient, tried to open the door, and then entered the building after finding that the door was un-locked. It is also possible that another occupant of Mr. Grant-'s building opened the door for the officers and allowed them to enter.

Nevertheless, it is clear that Mr. Grant's account of how the officers entered his apartment and searched it is entirely plausible and reasonable in light of the officers' testimony regarding their actions. The officers had reason to feel confi-dent about barging into Mr. Grant's apartment because they were acting on a highly credible tip and the tip specifically testi-fied where they should search for the gun. Tr1. 10. Moreover, no officer reported questioning Mr. Grant about drugs until after they entered the apartment despite the fact that the apartment smelled of recently smoked marijuana. See Tr1. 18, 88, 101; Tr3. 17. In fact, PO Owens testified that he did not recall hearing any conversation regarding the presence of drugs in the apartment until after he entered Mr. Grant's bedroom and recovered the gun. Tr1. 88, 89. If the officers were conducting a competent investigation in good faith, it would stand to reason that they would be eager to question Mr. Grant about drugs and conduct a cursory sweep of the apartment. Tr1. 18, 101, 150. The marijuana was not, however, recovered until well after the gun was found. Tr1. 24. This suggests that the offi-

12

cers did actually barge into Mr. Grant's apartment and conduct a rapid targeted search for the gun without stopping to make further inquiries.

Given the inconsistencies between PO Deleon's many sworn statements, PO Deleon's account of his interaction with Mr. Grant should not be credited. When asked if PO Owens told him that he had knocked on Mr. Grant's apartment door, PO Deleon initially testified that he could not recall whether PO Owens had said "apartment door or the door." Tr3. 39. Upon further questioning, PO Deleon stated that PO Owens had told him that he "knocked on the door" and that he had simply assumed that PO Owens was referring to the apartment door because PO Owens had gone to Mr. Grant's residence. DeLeon debriefed Owens August 5, 2007, mere hours after the relevant events; first by phone and later at the Bronx District Attorney's office. Owens then had a fresh memory of the events. DeLeon wrote a report and swore in the federal complaint and before the grand jury that (according to Owens) the police had knocked on the defendant's apartment door. DeLeon testified after the defendant had moved to reopen the hearing precisely to elicit the statements made to him about whether the police had knocked on the defendant's apartment door. We can infer that the government had briefed him on our wish to elicit from him testimony tending to refute the police's testimony about how they came to reach Mr. Grant's apartment. DeLeon did his best to thwart our effort by beating around the bush, at times pretending that he didn't understand

13

our question and giving non-responsive and overly expansive answers.  His demeanor suggested that he had assumed the role of an advocate rather than that of a fact witness.

Officers Owens and Stynes had each suffered adverse disciplinary police department findings; in Owens' case, he was found to have "abused his authority" in relation to his unlawful search of four victims and having been untruthful in the investigation of the victims' complaints.  Remarkably, while such blemishes on a policeman's record should be indelibly etched on the subject's memory, each barely had any memory of them and Owens particularly had to be shown documents before he grudgingly acknowledged having been disciplined as suggested in our cross-examination.  So much for these two's memories and credibility.

## ARGUMENT

Notwithstanding our repeated (orally and in writing) criticism of the government's constant repetition that Mr. Grant had "let" and "lead" the police into his apartment, when he had done no such thing, even if one were to credit the police testimony, the government goes right on repeating this absolute mis-characterization of the evidence.

We have previously argued this point to the court orally and in writing and incorporate it here by reference but the government persist in repeating it time and again.  This practice is reminiscent of the adage that repeating an inaccuracy time and again *ad nauseam* lends it credibility.  This may (or

14

may not) be acceptable in a law school moot court exercise, but it should not be countenanced in this context where a man's constitutional rights are in the balance.

Mr. Grant neither "led" nor "let" the police to and into his apartment. Even crediting the police testimony, he opened the building door leading to the street, the police entered the hallway in which Mr. Grant had no expectation of privacy, he walked back to his apartment without being asked for permission to enter it or giving it, he was followed by the police who entered the apartment right behind him as he necessarily had his back to them. That, scenario is a far cry from "leading" or "letting" the police to and into his apartment. There is no evidence that Mr. Grant had a rearview mirror through which he could have seen the officers a following him into his apartment. Mr. Grant had every right to go home and the police had none to follow him into it since even by their account he never unequivocally gave them consent to do so. The government shifts the burden to the defendant, arguing that his "failure" to resist the entry signifies consent. It had been our view that when the government had the burden of proving by a preponderance of the evidence that consent had been unequivocally given but had failed to satisfy this standard, the defendant had the burden of showing that his failure to resist (especially given the government's own scenario here) that unequivocal consent should be inferred or implied.

15

We have previously reviewed the law orally and in written submissions and incorporate those argument by reference.

The government fails to recognize or acknowledge that in the absence of a warrant or exigent circumstances, consent to enter a home require an **unequivocal** (see our previous written submission citing authorities for this requirement) consent and that, following an unlawful entry for lack of such consent, any admission or consent to search (even if then willingly given) and the fruits recovered must be suppressed as "fruits of the poisonous unlawful entry" unless and only if certain events intervening between the unlawful entry and the "in-house" consent have cured the illegal entry. Here, no such intervening events occurred. The government cannot and does not even attempt to argue that there was any such intervening event because there was none. The alleged "in-house-given" consent to search disputed by Mr. Grant was said to have been given within seconds the police's entry into the apartment.

In United States v. Snype, 441 F.3d 119, (2d Cir. 2006), Cert. Denied Snype v. United States, 2006 U.S. LEXIS 6297 (U.S., Oct. 2, 2006)the Second wrote:

> When a consent to search follows an illegal entry, this circuit requires the government to show more than the voluntariness of the consent; it must also demonstrate that "the taint of the initial entry has been dissipated" in order to admit evidence seized following the illegal entry. United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (internal quotation marks omitted). Oguns's identification of taint and voluntariness as distinct inquiries in evaluating the validity of certain consents derives from two Supreme Court decisions: Wong

16

Sun v. United States, which held that evidence seized after an illegal search must be suppressed unless the government shows that it, in fact, resulted from "an intervening independent act of [**23] free will" sufficient "to purge the primary taint of the unlawful invasion," 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); and Brown v. Illinois, which held that, where an inculpatory statement follows an unlawful arrest, a finding of voluntariness under the Fifth Amendment (based on Miranda warnings) does not obviate the need to make a separate Fourth Amendment determination as to whether the statement was "'sufficiently an act of free will to purge the primary taint.'" 422 U.S. 590, 602, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (quoting Wong Sun, id.).

A number of our sister circuits similarly construe Wong Sun and Brown to require a showing of attenuation as well as voluntariness for a consent following an illegal search or seizure to avoid the consequences of the exclusionary rule. See United States v. Washington, 387 F.3d 1060, 1072 n. 12 (9th Cir. 2004) ("For purposes of the Fourth Amendment, a determination that a consent was voluntarily made only satisfies a threshold requirement. The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation." (internal quotation marks and citations omitted)); United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir. 2003) [**24] ("Where the search following the illegal entry is justified based on alleged consent, courts must determine whether that consent was voluntary, and in addition the court must determine whether the illegal entry tainted that consent."); United States v. Lopez-Arias, 344 F.3d 623, 629 (6th Cir. 2003) ("Not only must the consent be valid, i.e. voluntary . . ., but the causal chain between the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule."); United States v. Santa, 236 F.3d 662, 676 (11th Cir. 2000) ("The voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure.")

As this court has previously observed, the question of whether a person's statement has been purged of the taint of prior official illegality "does not hinge on a simple 'but for' analysis, but rather 'must be answered on the facts of each case.'" United States v. Thompson, 35 F.3d 100, 105 (2d Cir. 1994) (quoting Brown v. Illinois, 422 U.S. at 603). The Supreme Court has identified the following factors as relevant to that consideration: (1) the giving of Miranda warnings, (2) the"'temporal proximity'" of the illegal entry and the alleged consent, (3) "'the

presence of intervening circumstances,'" and (4) "'<u>the</u>
<u>purpose and flagrancy of the official misconduct.</u>
(Emphasis added).

Because of very serious and extremely time-consuming com-
puter problems (a "Position Hyphen" box keeps popping up, re-
quiring constant interruptions and deletions) we apologetically
do not cover here but rely on our prior oral and written
submissions which we incorporate by reference on the issues of
"inevitable discovery" and "exigent circumstances.

We must however, note that at one point in the proceed-
ings, Your Honor posited the possibility that even if you found
that <u>Govt. Exhibit 1</u> had been "<u>concocted</u>" at the precinct
rather that when and where the police claimed; namely before
the search was conducted and in Mr. Grant's apartment, You
might nonetheless find that Mr. Grant had given oral consent to
search in the apartment before the search was conducted.

    We respectfully suggest that this would be extremely
troubling, because it would essentially accord credence to a
crucial part of policemen testimony, having rejected their cyn-
ical claim about the very same topic; the "concocted" part.

18

Finally, we ask that Your Honor assess the police testimony/ credibility in light of the well-known and documented culture when testifying in motions to suppress.

**People of the State of New York v. Barrios, and its progeny lament frequent Police Perjury ("tailored testimony") to defeat motions to suppress.**

In 1970, Frank S. Hogan, then the New York County District Attorney, filed a brief in the New York State Court of Appeals in People v. Tate, decided sub nom People v. Barrios, 28 N.Y.2d 361, 321 N.Y.S.2d 884, 270 N.E.2d 709 (1971). In his brief, the legendary prosecutor argued that police officers had long and often committed perjury when testifying (at motions to suppress hearings) that defendants had dropped drugs to the ground and that this false testimony had been given in order that the "plain view" doctrine justify the arrests and defeat the motions to suppress brought by defendants who were complaining that the police officers had simply searched them on the basis of mere hunches and suspicion that they were carrying concealed drugs.

Mr. Hogan's language bears periodic re-reading because defense lawyers are at times accused of "crying wolf" when alleging that perjury is often committed in the exclusionary area:

In his Barrios dissent, then-Chief Judge Stanley Full, joined by Judges Began and Bradawl, quotes with approval from Mr. Hogan's brief:

19

the District Attorney of New York County
informs us, in the brief submitted on these
appeals, that 'For the last ten years partic-
ipants in the system of justice--judges,
prosecutors, defense attorneys and police
officials--have privately and publicly ex-
pressed the belief that in some substantial
but indeterminable percentage of dropsy case-
s, the testimony (that a defendant dropped
narcotics or gambling slips to the ground as
a police officer approached him) is tailored
to meet the requirements of search-and-sei-
zure rulings' and 'it is very difficult in
many (such cases to distinguish between fact
and fiction.'. . .

When so able and dedicated a prosecutor as
District Attorney Frank Hogan believes that
there is basis for questioning the truthful-
ness of the testimony in a 'substantial * * *
percentage of dropsy cases,'. . .
People v. Barrios, 28 N.Y.2d 361, 370 (Full,
Ch.J. dissenting), 321 N.Y.S.2d 884, 890, 270
N.E.2d 709, 714 (1971) (Emphasis added)

Mr. Grant does not request suppression on the strength of
Berrios alone but cites it as proof of the long-standing credi-
bility problem facing defendants, lawyers and judges in the
exclusionary area.  In effect, he argues that Officer Barnett's
testimony should be examined in a historical context rife with
empirical knowledge that, for understandable reasons, policemen
do not care much for the exclusionary rules and sometimes (by
no means always or even in most cases) "tailor[ed]" their tes-
timony "to meet the requirements of search-and-seizure
rulings." Berrios, supra.

Mr. Grant and his counsel are mindful that when a defen-
dant at the criminal bar pits his or her credibility against
that of a police officer, judges are often reluctant to

20

announce officially and on the record that the officer's sworn word has been found wanting.  It is for that reason that _Barrios_ reminds us that judges and lawyers on both sides and "police officials" have often (albeit _privately_) expressed their skepticism of police testimony.

The police testimony here has all the earmarks of the "tailored" testimony so frequently given in similar circumstances.

In _People v. Barrios_, 28 N.Y.2d 361(1971), the New York Court of Appeals considered five consolidated cases where the defendants, joined by the District Attorney of New York, challenged the admissibility of glassine envelopes containing heroin, arguing that police testimony in "dropsy" cases is "inherently untrustworthy" and therefore the burden of proving admissibility should fall on the People rather than requiring the defendant to show inadmissibility.  _Id._ at 365-66.  The problem of police perjury, the defendants argued, _Barrios_, 28 N.Y.2d at 368, arose in the wake of _Mapp v. Ohio_, 367 U.S. 643 (1961), where the Supreme Court held that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." _Mapp_, 367 U.S. at 655.  The court rejected the defendants' arguments because "a change in the burden of proof would be ineffective to combat the alleged evil about which the defendants herein complain" and "policemen should not be singled out as suspect." _Barrios_, 28 N.Y.2d at 368-69.  In his dis-

21

sent, however, Chief Judge Full cited the brief of then New York County District Attorney Frank S. Hogan with approval:

> For the last ten years participants in the system of justice – judges, prosecutors, defense attorneys and police officials, have privately and publicly expressed the belief that in some substantial but indeterminable percentage of dropsy cases, the testimony [that a defendant dropped narcotics or gambling slips to the ground as a police officer approached him] is tailored to meet the requirements of search-and-seizure rulings and 'it is very difficult in many [such] cases to distinguish between fact and fiction.' . . . 'When so able and dedicated a prosecutory as District Attorney Frank Hogan believes that there is basis for questioning the truthfulness of the testimony in a 'substantial * * * percentage of dropsy cases,' . . .
> Id. at 370 (Full. Ch.J. dissenting).

**The Full, Began, Bradawl distrust of "Dropsy" Testimony has Garnered Support**

**A.    Federal Courts**

In <u>Unites States v. Resterpo-Cruz</u>, 457 F.Supp. 1048 (S.D.N.Y. 1982), the government contended that the defendant consented to the search that led to the seizure of the incriminating evidence. Id. at 1051.  The court suppressed the evidence although an officer had testified that the defendant had voluntarily consented to the search. The court found that testimony improbable because it had appeared to be "tailored testimony."  Id. at 1057.[1]

---

1 The District of Connecticut recognized the possibility of prosecutorial truth tinkering in dropsy cases in a case where the court granted a motion to suppress for unregistered possession of

The Supreme Court itself has acknowledged the recurring problem of police perjury in the exclusionary area.  In Unites States v. Janis, 428 U.S. 433 (1976), the Court recognized the historical experience of police perjury in dropsy cases.

> There are studies and commentaries to the effect that <u>the exclusionary rule tends to lessen the accuracy of the evidence presented in court because it encourages the police to lie in order to avoid suppression of evidence</u>. (Emphasis added) <u>Id</u>. at 447 &  n.18.

Justice William Brennan, in a dissent, cited Barrios, recognizing "<u>the apparent prevalence of police perjury</u>." Briscoe v. LaHue, 460 U.S. 325, 365 (1983).

Finally, without citing Barrios or referring to the endemic problem of police perjury in suppression motion testimony, Judge John F. Keenan, of this court (a former New York County career prosecutor who has lectured in favor of abolishing the exclusionary rules and is extremely savvy in the ways of the New York streets and of how the police ply their trades there) none-the-less rejected police testimony in granting suppression to the defendant Mary Day in United States v. Lavin and Day, 92 Cr. 326(JFK), 1992 WL 373486 (S.D.N.Y. 1992) (rul-

_____

a destructive device, limiting the authority of police officers to stop "lost" motorists in part due to the dangers of officers fabricating suspicions about individuals being lost.  United States v. Dunbar, 470 F.Supp. 704, 706, 708 (Conn. 1979).

ing that contraband had not been in "plain view" notwithstanding policeman's claim that it had been visible to him) and in United States v. Roldan, 97 Cr. 567(JFK), 1997 WL 767564 (S.D.N.Y. 1997) (ruling that the defendant's alleged consent to search had not even been asked, much less been given, despite a policeman's testimony to the contrary).

### B.  New York State Courts

In People v. Carpenito, 574 N.Y.S.2d 218 (App.Div. 1991), citing Barrios, the court granted a Darden hearing (People v. Darden, 34 N.Y.2d 177 (1974)) to determine if the People's central informant in support of the search warrant really existed and whether he imparted the information to the detective as alleged.  The court allowed the People to produce other evidence to rebut the defense's assertion of police fabrication because the informant was unavailable, purportedly due to fear. Carpenito noted the problem of police perjury, stating that Darden "was born of a concern that an overzealous police officer might create a fictitious informant to justify an illegal search or seizure" because of the "increasing concern with the problem of perjured police testimony discussed in Barrios." Carpenito, 574 N.Y.S.2d at 221-223. (Emphasis added.)

In People v. Cesar, 491 N.Y.S.2d 319 (1985), the police were conducting a narcotics investigation in a hotel based on an anonymous tip, and entered the defendants' room, claiming that this entry was justified by a sighting that one of the

occupants had dropped a bag of white powder. Id. at 321-22. Suggesting ongoing concern with police perjury in the "dropsy" context, the court referred to "all the criticism 'dropsy' evidence has received in the past by commentators, prosecutors and judges alike, who have expressed alarm at het substantially potential for fabrication in these cases." Id. at 329-330 (citing Barrios, 28 N.Y.2d at 370-72 (Full, J. dissenting)). The court rejected the police testimony and found the police entry into the room based on the alleged but false "dropsy" evidence improper. Id..

Anticipating Barrios by a year, the noted educator and judge Irving Younger presiding in People v. McCurty, 314 N.Y.S.2d 194 (1970) already lamented the problem of police perjury in New York "dropsy" cases and cited various statistics in support that sorry record. Id. at 196-98.

> Were this the first time a policeman had testified that a defendant dropped a packet of drugs to the ground, the matter would be unremarkable . . . [But] each year in our criminal courts policemen give such testimony . . . , perhaps thousands of cases . . . The difficulty arises when one stands back from the particular cases and looks at a series of cases. It then becomes apparent that policemen are committing perjury at least in some of them, and perhaps in nearly all of them." Id. at 196-97.

In People v. Frias, 423 N.Y.S.2d 810, 811-813 (1979), the court acknowledged the problem as well, noting that Barrios and

McCurty had questioned the reliability of "dropsy" testimony and urging close scrutiny in determining the reliability of such testimony.

In <u>People v. Quinones</u>, 402 N.Y.S.2d 196, 197 (1978), the court held police testimony that the defendant had simply thrown a bag of narcotics to the floor when the officer approached him to be incredible as a matter of law and that the testimony was tailored. <u>Id.</u> That court cited Judge Full in <u>Barrios</u>, stating that "'[d]ropsy cases have been criticized frequently as attempts to legitimize searches-and-seizures otherwise illegal. <u>Id.</u> at 198.

### C. Secondary Sources

Recent secondary sources have acknowledged <u>Barrios</u> and the persisting problem of police perjury in New York in the exclusionary context. Commentators note that rulings such as <u>Mapp</u> have simply forced the police to be more savvy in their constitutional violations by concocting "dropsy" situations, for example. David Luban, <u>The Warren Court and the Concept of a Right</u>, 34 Harv. C.R.-C.L. L. Rev. 7, 18 & n.26 (1999). The dropsy problem was so "frequent and notorious" that "the District Attorney was willing to stipulate to the gravity of the problem" in <u>Barrios</u>, <u>Id.</u> at n.38, and courts began to generally question the credibility of police testimony. Note, <u>The Plain Touch Doctrine and Confusion Following Unites States v.</u>

Dickerson: the Terry Frisk Needs an Expansion, 39 St. Louis
U.L.J. 1053, 1079 (1995).

After Barrios, formal investigations into the NYPD have
documented a continuing problem of police perjury in the
exclusionary context. Robert M. Pitler2, Independent State
Search and Seizure Constitutionalism: the New York State Court
of Appeals; Quest for Principled Decision Making, 62 Brook. L.
Rev. 1, 108-109 & n.410 (1996) (citing the Report of the
Commission to Investigate Allegations of Police Corruption and
the city's Anti-Corruption Porcedures 71-89, 91-112, 116-20
(1972) (known as the Knapp Commission Report) and the Report of
the Commission to Investigate Allegations of Police Corruption
and the Anti-Corruption Procedures of the Police Department,
36-43 (1994) (hereinafter the Mollen Commission Report).
Indeed, some have gone so far as to say that "police officers
routinely lie in the Fourth Amendment context." See Andrew
McClurg, Good Cop, Bad Cop: Using Cognitive Dissonance Theory
to Reduce Police Lying, 32 U.C. Davis L. Rev. 389, 400-01
(1999) (citing Sarah Barlow, Patterns of Arrests for
Misdemeanor Narcotics Possession: Manhattan Police Practices
1960-62, 4 Crim. L. Bull. 549, 549- 50 (1968) (documenting the
effect that Mapp had had on police perjury in New York).  The
Mollen Commission found that in New York, "the practice of
police falsification ... is so common in certain precincts that

---

2 Former Chief of Appeals Bureau, New York County District
Attorney's office.

it has spawned its own word: 'testilying.' " Gabriel Chin & Scott Wells, The "Blue Wall of Silence" as Evidence of Bias and Motive to Lie: a New Approach to Police Perjury, 59 U. Pitt. L. Rev. 233, 234; Christopher, Slobogin, Testilying: Police Perjury and What To Do About It, 67 U. Colo. L. Rev. 1037, 1040-43 (finding that "the most common venue for testilying is the suppression hearing and the most frequent type of suppression hearing perjury is post hoc fabrication of probable cause" and that police motivation is often due to pressure for "results" and a desire to bring the "guilty" to justice rather than letting them get off on constitutional "technicalit[ies]").

## IV. Conclusion

From Judge Full to the Mollen Commission Report, the NYPD has a documented history of police perjury.  The court need not make any general assumptions about the falsity or veracity of police testimony here, but is requested to consider this well-known police culture in assessing the policemen's credibility in this case.

**WHEREFOR,** it is respectfully requested that Richard Grant's motion to suppress be granted in all respects because the government has not met its burden of proof.

New York, NY,
July 2, 2008

Respectfully submitted,

Roland Thau, Esq.
With Stephen Clarke,
NYU Law School
Federal Defender of New York, Inc.
Attorney for Defendant,

**RICHARD GRANT**

52 Duane Street, 10th Floor
New York, New York 10007
tel.: (212) 417-8733