UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————x

UNITED STATES OF AMERICA,

       -against-

RICHARD GRANT,

       Defendant.

———————————————————x

07 Cr. 1119 (CM)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/1/08

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION DENYING DEFENDANT'S MOTION TO SUPPRESS AFTER HEARING

McMahon, J.:

    Grant filed a motion asking the Court to suppress all the physical evidence seized from his home and to suppress his post-arrest statements. The Court granted defendant a hearing on his motion and the hearing was held over three days: April 30, 2008, May 7, 2008 and June 18, 2008. The following constitutes the Court's findings of fact, conclusions of law and decision in connection with the hearing:

### FINDINGS OF FACT

    1. On or about August 3, 2007, the New York City Police Department (NYPD) received information through its "gun stop" hotline that an individual named Richard Grant, illegally possessed a firearm in the bedroom of his first floor apartment at 835 East 221st Street, Bronx, NY.

    2. The matter was referred to Sergeant Edward Murphy, who was working on gun stop calls with Officers Joseph Stynes and Brendan Owens.

    3. In keeping with his usual practice, Sgt. Murphy obtained a photograph of Mr. Grant and ran a criminal history check on him.

    4. On August 4, 2007, the three officers went to 83 East 221st Street in the Bronx, arriving shortly after 10 PM.

    5. The officers were dressed in plain clothes, with police shields around their necks. They were driving an unmarked car.

    6. When the officers arrived at the defendant's residence, there were several individuals on an outside balcony above the front door of the house.

7. The officers identified themselves as police officers and asked if the individuals would open the front door to the building.

8. The individuals refused to open the front door.

9. Sgt. Murphy then knocked on the front door of the house and rang the doorbell, seeking entry into the house.

10. The front door of the house opens into a hallway, not directly into Grant's apartment. The front door to Grant's first floor apartment is at the far end of the hallway – about ten feet from the door.

11. Grant was in his first floor apartment and heard the doorbell ring.

12. The officers testified that Grant came to the door after they rang the bell. Grant testified that he never left his apartment, and that when he opened his door to look out and see who was at the door, the officers were already in the hallway in front of his apartment. I credit the officers' testimony that Grant let them into the building.

13. Sgt. Murphy identified the officers to Grant as police and told him that they wanted to talk to him.

14. Grant turned from the front door and walked away from the officers toward his apartment. The officers followed him down the hall. Grant neither invited the officers to follow him nor did he physically impede the officers from following him.

15. None of the officers spoke to Grant as they followed him down the hall, and Grant did not speak to the officers.

16. Grant walked into his apartment. The officers followed him in. Grant neither invited the officers to follow him into the apartment nor physically impeded the officers from following him into the apartment.

17. Grant never told the officers in words that they could enter his apartment.

18. Inside the apartment is a hall. On the right, inside the front door, is a door leading to Grant's bedroom. On the left was the kitchen, which opened into the living room. There was a door in the living room that opened into Grant's son's bedroom. The living room can be seen from the kitchen. At least a portion of the interior of the child's bedroom can be seen from the kitchen. The interior of Grant's bedroom cannot be seen from the kitchen.

19. Sgt. Murphy ordered Grant to sit down at the kitchen table and he himself sat at the table.

20. Officer Owens conducted a protective sweep immediately upon entering the apartment. He somehow managed to miss the drug paraphernalia that were, by everyone's account (including Grant's), located on the table in the living area.

21. The apartment smelled of marijuana smoke. The officers noticed the smell. Grant testified that he had been smoking marijuana in the apartment that night.

22. The child – of whom Grant has sole custody – was in his bedroom. Sgt. Murphy directed Officer Stynes to stay with the child.

23. Sgt. Murphy told defendant that the officers had been given a tip that Grant had a gun in the apartment. He asked Grant if he had a gun. Grant said that he did not have a gun.

24. Sgt. Murphy testified that he asked defendant if the officers could search the premises, and that Grant gave oral permission to search the apartment. Grant testified that he did not give permission to search – indeed, Grant testified that he was not asked for permission.

25. I conclude, after carefully considering all the evidence, that Murphy asked Grant for permission to search and that Grant gave Murphy oral permission to search the apartment.

26. The purpose of the gun stop program is to check out reports of possible illegal guns. The goal of the officers who make gun stop calls is to get inside apartments and look around in cases where it would not be possible to obtain a warrant (because of an anonymous telephone tip, for example). Since no search warrant has issued, the program's success is entirely dependent on the officers' obtaining both permission to enter and permission to search.

27. The mere fact that the officers can get into the apartment is not enough to confer permission to search the apartment (other than to see items in plain view). Therefore, it would, as a matter of logic, be an integral part of the gun stop program that officers ask the person they were visiting if they could search his residence. For this reason, I credit Sgt. Murphy's testimony that he sought Grant's permission to search for a gun, and I do not credit Grant's testimony that Sgt. Murphy did not seek his consent to search.

28. The fact that Grant denied having a gun does not suggest that it was illogical for Sgt. Murphy to ask if he could search for the "non-existent" gun, as defendant argues. Rather, it seems logical that a police officer, having received an anonymous citizen gun report, and confronted with a suspect who denied possessing a gun, would say, "Mind if we look around, just to confirm that?" or words to that effect.

29. Consent to search, like consent to enter, may be express or implied. In this case there is no evidence to suggest that consent was given implicitly. Either Grant verbally gave permission to search or he did not.

30. I credit Murphy's testimony that Grant gave oral permission to search the apartment for the gun – in significant part because, in both his oral responses during questioning at the precinct and in a written confession, Grant himself stated that he gave the officers permission to search for the gun (See Finding of Fact 51).

31. Grant argues that the he would never have given consent to search, because he had a powerful motive not to permit the police to search his apartment, where both a gun and drugs were located – that motive being Grant's desire to do nothing that might cause him to lose custody of his son, which he fought so hard to obtain. However, I do not find this argument persuasive. On more occasions than I can count, defendants have elected to speak to police when they have no obligation to do so, have made statements without counsel present after being arrested and advised of their Miranda rights, and have allowed the police to enter their dwellings or search their cars. These elections are always illogical, but in my experience they happen all the time. The gun, as it turns out, was well hidden; PO Owens testified that he recovered it in a leather pouch located underneath large black plastic bags in a closet. Grant might well have hoped that the officers would overlook it.

32. Sgt. Murphy also testified that Grant gave written consent to search the apartment for "drugs and guns" while sitting in the kitchen, using a "consent form" that the sergeant wrote out on a piece of paper and that Grant signed. Murphy testified that he took "pedigree information" from Grant when he created the "consent form."

33. The "consent form" (which, although a photocopy, appears to be written on a page torn from a police officer's memo book, perhaps from a reporter's note pad) was admitted into evidence as GX 1. It contains certain information that could only have been obtained from the defendant's driver's license, including his driver's license number and his former address. Driver's license number and former address are not information that is part of what police officers commonly refer to as "pedigree;" it is not asked for on a standard NYPD pedigree sheet that gets filled out during booking, and none of the officers who testified at the hearing included either of these items in their description of pedigree.

34. Therefore, it is obvious that the "consent form" was not written until after Sgt. Murphy obtained Grant's driver's license. However, no police officer, including Sgt. Murphy, testified that Sgt. Murphy asked Grant to produce his license, or any other identification, while they were sitting in the kitchen.

35. Grant argues that the "consent form" was not created in his apartment, but was written later, at the precinct, after he was arrested (and where his wallet would have been taken from him and vouchered).

36. It is possible that Sgt. Murphy obtained a copy of Grant's driver's license before arriving at Grant's apartment. The sergeant testified that, pursuant to his usual practice, he obtained a photograph of Grant before proceeding to his apartment. The record does not indicate how he obtained that photograph. Obviously, there is a photograph on a New York State driver's license.

4

Indeed, I can think of no other public record on which a photograph would appear. However, I do not know whether a police officer can access the computerized driver's licenses that are stored in Department of Motor Vehicles computers, because there is no evidence in the record on the point. So a finding that Sgt. Murphy obtained a copy of Grant's license prior to going to his home would be based on speculation.

37. Since there is no evidence of how Sgt. Murphy obtained Grant's license, I cannot reach a conclusion about whether the form was written in the kitchen. I am not prepared to accept Sgt. Murphy's representation that he wrote out the "consent form" in the kitchen in the absence of some explanation about how he obtained defendant's driver's license – which was notably not forthcoming, even though, at the court's insistence, Sgt. Murphy was recalled to the stand for the very purpose of exploring how he came to have the driver's license. However, my doubts about the provenance of GX 1 do not cause me to conclude that Sgt. Murphy was lying about receiving Grant's oral consent to search *for the gun*.

38. There is, however, no credible evidence that Sgt. Murphy asked for oral consent to search for any drugs prior to the finding of the gun; Sgt. Murphy did not so testify and the defendant did not so testify. I thus decline to find that Grant gave the officers oral permission to search *for drugs* prior to the time that the gun was found.

39. The Gun Stop tip Sheet (GX 3) reveals that the tipster said the gun would be found on Grant's person or in his bedroom. Officer Owens went to defendant's bedroom to search for the gun. He found the gun in a leather pouch inside a closet in defendant's bedroom and returned to the kitchen to advise the sergeant.

40. Grant testified that Murphy interrogated him, asking him a number of questions while Owens was conducting the search of the bedroom, including questions about his son and his son's mother, as well as how long he had lived in the apartment. I credit this testimony.

41. After Owens returned to the kitchen with the gun, Sgt. Murphy asked Grant if there was anything else in the apartment about which the police should know. Grant pointed to his kitchen cabinet and said it contained crack. Murphy opened the cabinet and recovered crack cocaine, a jar containing marijuana and various drug-related items, including a digital scale, glass jars and plastic baggies of the sort used to package drugs.

42. Murphy asked Grant if there was someone he could call to take care of his son. Grant called his sister. The officers remained in the apartment with Grant until she arrived. It is entirely possible that Murphy told Grant that if no one were available to take care of the child, he would have to call Child Protective Services.

43. While waiting for Grant's sister to arrive, Sgt. Murphy saw a pipe with marijuana residue and some loose marijuana sitting on a table in defendant's living room, in plain view. He seized these items.

5

44. When Grant's sister arrived, the officers took Grant into the hallway outside his apartment, cuffed him and transported him to the precinct, where his arrest was processed.

45. Grant was properly Mirandized by PO Dannis DeLeon the day after his arrest. (GX 2) Grant answered "yes" to each question on the "Miranda form" used by the NYPD – including the question about whether he would like to answer the officers' questions – and initialed his responses on the form.

46. Grant elected to talk to the officers after being Mirandized.

47. Grant was not threatened or coerced into signing the Miranda form or responding in the affirmative to its questions. I do not credit Grant's testimony that PO DeLeon threatened that Child Protective Services would take away Grant's child unless he wrote a confession, or that Officer DeLeon said anything like, "I know that you already signed a confession for the NYPD but you need to do it again for the feds."

48. All statements made to Officer DeLeon after Grant was Mirandized were voluntary.

49. At no time while he was talking to Officer DeLeon did Grant indicate that the police had engaged in any misconduct, either at the apartment or at the precinct.

50. After DeLeon finished questioning Grant, he asked Grant to put his statement in writing. Grant did so, on the back of the signed Miranda waiver.

51. In both his oral and his written statements, Grant indicated that he gave consent to the search of his apartment.

CONCLUSIONS OF LAW

Defendant's motion requires the Court to review separately: (1) The entry by police into Grant's building and apartment; (2) the recovery of the gun from Grant's bedroom closet; (3) the recovery of the crack and drug paraphernalia from the kitchen cupboard; (4) the recovery of the marijuana pipe and loose marijuana found on a table in the living room; and (5) defendant's post arrest statements to Sgt. Murphy and Police Officer DeLeon.

The Fourth Amendment prohibits unreasonable searches and seizures, and a search conducted without a valid warrant is "per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotation marks and citation omitted). One of those exceptions arises when a search is freely and voluntarily consented to by either a lawful occupant of the premises or someone with similar common authority over the place to be searched. Id. The Government bears the burden of proving that the consent to search was indeed voluntary. Id. at 222. Voluntariness must be the product of an "individual's free and unconstrained choice" and may not be established

6

simply by a person's "mere acquiescence in a show of authority." See United States v. Wilson, 11 F.3d 346, 351 (2d Cir.1993). Nonetheless, a valid consent need not be expressed through any particular phrase, and it "can be found from an individual's words, **acts or conduct**." Krause v. Penny, 837 F.2d 595, 597 (2d Cir.1988) (emphasis added). "Whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041.

*Police Entry Into the House and Apartment*

As a threshold matter, the police entry into the house and Grant's apartment did not violate the Fourth Amendment. I have concluded from the evidence adduced at the hearing that Grant met the officers at the front door of the building, the officers identified themselves, Sgt. Murphy told defendant that they (the police) wanted to talk to him, Grant admitted the officers into the building, then turned around and walked ahead of them into his apartment. Implicit in Grant's actions and his conduct is that he was willing to speak with the police, but wanted to speak with them inside his apartment. The police never attempted to force or coerce their way into either the house or the apartment. Grant simply led them in. Such "affirmative acts of cooperation" demonstrates that Grant consented to the entry. See United States v. Rosi, 27 F.3d 409, 413-14 (9th Cir. 1994).

*The Search of the Apartment*

Where and when defendant signed the consent to search form are questions the Court need not ultimately resolve to rule on defendant's motions. With respect to the recovery of the gun, the Court has found from the evidenced adduced at the hearing that Sgt. Murphy asked Grant for permission to search for "the gun" and that Grant gave Murphy oral permission to search the apartment for "the gun." As far as the gun is concerned, that is the end of the story.

However, the crack cocaine, a jar containing marijuana and various drug-related items found in Grant's kitchen cabinet were recovered by virtue of Sgt. Murphy's question – "Do you have anything else in the apartment?" – which was asked **after** the gun was found. Miranda warnings would have been a necessary predicate for such a question, since once the gun was found defendant was certainly under arrest and not free to leave. Thus, the questioned presented is: Was the recovery of the drugs from the kitchen cabinet "fruit of the poisonous tree?" There was a time, not to long ago, when the answer would have been most certainly yes. However, that was before United States v. Patane, 542 U.S. 630, 641 (2004).

In Patane, defendant violated a court restraining order, that prohibited him from having any contact with his ex-girlfriend, by attempting to call her on the telephone. Officer Tracy Fox of the Colorado Springs Police Department began to investigate the matter. A county probation officer informed an agent of the Bureau of Alcohol, Tobacco, and Firearms (ATF), that Patane, a convicted felon, illegally possessed a .40 Glock pistol. The ATF relayed this information to Detective Josh Benner of the Colorado Springs Police. Detective Benner and Officer Fox proceeded to Patane's

7

residence. After reaching the residence and inquiring into defendant's attempts to contact O'Donnell, Officer Fox arrested Patane for violating the restraining order. Detective Benner attempted to advise Patane of his Miranda rights but got no further than the right to remain silent. At that point, Patane interrupted, asserting that he knew his rights, and neither officer attempted to complete the warning.[1] Detective Benner then asked Patane about the Glock, to which he stated: "I am not sure I should tell you anything about the Glock because I don't want you to take it away from me." Detective Benner persisted, and defendant told him that the pistol was in his bedroom. Patane then gave Detective Benner permission to retrieve the pistol. Detective Benner found the pistol and seized it. Patane, 124 S. Ct. at 2624-25.

The Court held that the detective's failure to give Miranda warnings after arresting Patane and before questioning him about the weapon he reportedly possessed did not require suppression of weapon at felon-in-possession-of-firearm trial. Judge Thomas, in his plurality opinion, wrote:

> [T]he Miranda rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the Miranda rule to this context. And just as the Self-Incrimination Clause primarily focuses on the criminal trial, so too does the Miranda rule. The Miranda rule is not a code of police conduct, and police do not violate the Constitution (or even the Miranda rule, for that matter) by mere failures to warn. For this reason, the exclusionary rule articulated in cases such as Wong Sun does not apply.

Id. at 2626.

> [T]he Self-Incrimination Clause contains its own exclusionary rule. It provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Amdt. 5. Unlike the Fourth Amendment's bar on unreasonable searches, the Self-Incrimination Clause is self-executing. We have repeatedly explained "that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."

Id. at 2628 (citations omitted).

---

[1] Justice Kennedy in his concurring opinion, joined by Justice O'Connor, wrote: "Unlike the plurality, however, I find it unnecessary to decide whether the detective's failure to give Patane the full Miranda warnings should be characterized as a violation of the Miranda rule itself, or whether there is "[any]thing to deter" so long as the unwarned statements are not later introduced at trial. Ante, at 2628-2629." Patane, 124 S. Ct. at 2631. In the present case, it is clear that Miranda warnings were never given until later at the precinct.

8

In the present case, there is no evidence that Grant was coerced or compelled in any way to answer Sgt. Murphy's question: "Do you have anything else in the apartment?"

Accordingly, Grant's motion to suppress the evidence seized in the kitchen cabinet is denied. Of course, his statement – admitting that there was crack in the cupboard – is suppressed, as the fruit of post-arrest interrogation with out the benefit of Miranda warnings.

The final items Grant seeks to suppress are the pipe with marijuana residue and some loose marijuana that Sgt. Murphy found sitting on a table in defendant's living room. These items were found in plain view while the officers were waiting for Grant's sister to come and care for defendant's son. Since the officers were lawfully in the apartment, the items were in plain view and the incriminating nature of the items was apparent without inspection, the seizure of these items was lawful. See Coolidge v. New Hampshire, 403 U.S. 443, 465-66 (1971).

*Grant's Written and Oral Statements*

Defendant argues that his statements to Officer DeLeon should be suppressed on the ground that DeLeon threatened that Child Protective Services would take away Grant's child unless Grant wrote a confession.

The purpose of Miranda warnings "is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights." Moran v. Burbine, 475 U.S. 412, 425 (1986). "Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." United States v. Anderson, 929 F.2d 96, 99 (2d Cir.1991). "To prove a valid waiver [of *Miranda* rights], the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir.1995).

The totality of the circumstances surrounding defendant's oral and written statements suggest that no coercive tactics were employed to obtain those statements. Defendant is an educated and sophisticated adult who is well aware of his legal rights. He received an honorable discharge from the United States Marine Corps and has extensive experience with litigation and the court system, having initiated a protracted custody battle against his son's mother. Defendant was given his Miranda warnings by Officer DeLeon prior to the officer's asking him questions and before defendant made his oral and written statements. Grant answered "yes" to each question on the Miranda form and initialed his responses on the form. As stated above, I find incredible defendant's testimony that Officer DeLeon threatened to call Child Protective Services if defendant did not confess. I absolutely credit Officer DeLeon's testimony that he neither threatened nor coerced defendant into signing the Miranda form or making statements.

Accordingly, defendant's motion to suppress his oral and written post-arrest statements (other

9

than as held above) is denied.

This constitutes the decision and order of the Court.

August 1, 2008

Colleen McMahon
U.S.D.J.


BY FAX TO:

Carrie Heather Cohen
U.S. Attorney's Office
Souther District of New York
One St. Andrew's Plaza
New York, NY 10007
Fax: (212) 637-2937

Roland Thau
Federal Defenders of New York Inc.
52 Duane Street
10th Floor
New York, NY 10007
Fax: 212-571-0392